# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3030

_____

| | | |
|---|---|---|
| Connie L. Blackmon, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Pinkerton Security & Investigative | * | Southern District of Iowa |
| Services, also known as Pinkerton's, | * | |
| Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  April 21, 1999

Filed:  June 30, 1999

_____

Before McMILLIAN, LOKEN and MURPHY, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Connie L. Blackmon appeals from a final order entered in the District Court for the Southern District of Iowa granting appellee, Pinkerton Security & Investigative Services, Inc., judgment as a matter of law and withdrawing the jury's award in her favor of $100,000 in punitive damages for sexual harassment and retaliation in employment. See Blackmon v. Pinkerton Security & Investigative Services, Inc., No. 4-96-CV-80682 (S.D. Iowa June 4, 1998) (hereinafter "Order").  On appeal,

appellant argues that the district court erred in granting appellee's motion for judgment as a matter of law on the punitive damages award because there was sufficient evidence to support the jury's determination that appellee acted with malice or reckless indifference to her federally protected rights. For the reasons discussed below, we affirm in part and reverse in part the judgment of the district court, and remand with directions to reinstate the punitive damages award.

Jurisdiction in the district court was proper based upon 28 U.S.C. §§ 1331, 1343. Jurisdiction on appeal is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

BACKGROUND

"'We recite the facts in the light most favorable to the jury verdict and the district court's findings.'" See Morse v. Southern Union Co., No. 98-2050, 1999 WL 212844, at *1 (8th Cir. Apr. 14, 1999) (quoting Denesha v. Farmers Ins. Exch., 161 F.3d 491, 496 (8th Cir. 1998))(internal citations omitted). In doing so, we "assume all conflicts in the evidence were resolved in [appellant's] favor . . . , assume as proved all facts that [her] evidence tended to prove, and give [her] the benefit of all favorable inferences that may reasonably be drawn from the facts proved." Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 634 (8th Cir. 1998) (Browning) (citing Ryther v. KARE 11, 108 F.3d 832, 844 (8th Cir. ) (en banc), *cert. denied,* 117 S. Ct. 2510 (1997)); see also Bailey v. Runyon,167 F.3d 466, 468 (8th Cir. 1999).

Appellee is a company which provides security services to its clients under contract. From May 1995 until her termination in March 1996, appellant was employed by appellee as a security guard on appellee's account at the Firestone Manufacturing Plant (hereinafter "the Plant" or "Firestone account"). In mid-October 1995, appellant was transferred from a day shift to a night shift (B-Team) at the Plant and was promoted to an "acting corporal" position. See Appellant's Appendix at 143,

238 (hereinafter "App.") (trial transcript at 69, 284) (hereinafter "Tr."). On B-Team, appellant worked with four males: Chris Eichhorn, Thomas Robinson, Jeff Anderson, and the shift supervisor, Sergeant Chad Murphy. See id. at 150 (Tr. at 80).

From the time she started with B-Team until she was terminated, her four co-workers frequently engaged in constant, graphic sexual conversations in her presence. For example, they used lurid language to comment on the body parts of women entering the Plant and describe sex acts they would like to perform on such women, they graphically described both their sexual conquests and fantasies to each other, and they constantly and repeatedly used vulgar language to refer to sex acts and the female anatomy. See id. at 150-57, 273-75 (Tr. 80-87, 414-16). Sergeant Murphy often instigated these sexually explicit conversations. See id. at 266-67, 273-75 (Tr. at 366-67, 414-16). Appellant repeatedly complained directly to her co-workers and Sergeant Murphy about this conduct and requested that it cease. Rather than addressing her grievances, Sergeant Murphy accused appellant of complaining because she was not "getting any [sex]" or "was on the rag." Id. at 151, 155 (Testimony of appellant, Tr. at 81, 85).

After her complaints to Sergeant Murphy failed, appellant took her complaints up the chain of command, and began to suffer adverse employment actions. On November 10, 1995, appellant complained to Lieutenant Eugene Ackerly, who supervised all employees on the Firestone account, of the lurid conversations she was enduring. See id. at 149 (Tr. at 76). The next day, November 11, 1995, appellant received the first of several adverse employment actions: Sergeant Murphy reprimanded appellant for not completing a portion of her security patrol, called "getting a strip". See id. at 158 (Tr. at 88). However, failure to "get a strip" had not been reprimanded in the past, and appellant's male co-workers were not punished for the same conduct. See id. at 158-59 (Tr. at 88-9). In addition, Sergeant Murphy told appellant that she could no longer take her breaks at a location in the Plant known as the "power house," where appellant had previously told Sergeant Murphy she took her

breaks to escape the sexually explicit conversations at the main gate. See id. at 207 (Tr. at 93). Furthermore, when appellant made complaints to Sergeant Murphy about the sexually explicit conversations, he now sent her to stand watch alone at another gate, stating that, if she didn't like the way he and her co-workers talked, she did not have to be around them. See id. at 169, 176 (Tr. at 100, 107).

On December 7, 1995, after appellant had complained to Lt. Ackerly several times, Lt. Ackerly was in the main gate during appellant's shift. Lt. Ackerly told appellant in front of her co-workers that her promotion and corporal's stripes were "a joke," that she was not receiving a corporal's salary, and that she never would be paid a corporal's salary. Id. at 173 (Tr. at 104). Lt. Ackerly also stated that he "did not promote women on his account, he got rid of them." Id. at 174 (Tr. at 105). Finally, he told appellant's co-workers that they "[didn't] have to listen to her opinions or what she [told them] to do." Id. at 173 (Tr. at 104). In addition, several witnesses testified that Lt. Ackerly frequently engaged in the same type of sexually explicit conversations as Sergeant Murphy and the others and often referred to women--including appellant-- as "bitches" and "cunts". Id. at 267-68, 276-77, 298 (Tr. at 367-68, 417-18, 451).

The sexually explicit conversations continued unabated. However, in late December 1995, when Sergeant Murphy told appellant he heard she "shaved her pussy" and asked whether she "liked getting fucked better when [she] shaves [her] pussy," appellant decided to complain again to Lt. Ackerly. Id. at 195-96 (Testimony of appellant, Tr. at 176-77). Since Lt. Ackerly was not available at that time, appellant decided to meet with the District Manager for Des Moines, Vince Rodriguez.

On December 26, 1995, appellant met with Rodriguez and Nancy O'Leary, Pinkerton's personnel administrator, and told them that her co-workers were engaging in constant, sexually-explicit conversations. See id. at 184 (Tr. at 115). She reported what they had been saying and even gave Rodriguez and O'Leary copies of contemporaneous notes she had taken since November 1995 that documented some of

-4-

the most lurid conversations, as well as the reprimand she received. See id. at 185 (Tr. at 116). Rodriguez and O'Leary believed appellant was complaining of sexual harassment. See id. at 360 (testimony of Rodriguez, Tr. at 584), 297 (testimony of O'Leary, Tr. at 447). Appellant mentioned that she had an appointment to see a lawyer about the situation, but Rodriguez asked her to let them "try to take care of it first." Id. at 186 (Tr. at 117). At the end of the meeting, Rodriguez told appellant he would investigate her complaints. See id. at 345 (Tr. at 560).

A day or two after meeting with appellant, Rodriguez informed Lt. Ackerly of appellant's complaints. See id. at 345-47 (Tr. at 562-64). Although it is unclear from the evidence whether Rodriguez named appellant as the complaining party (Rodriguez testified that he did not use appellant's name, see id. at 347 (Tr. at 562), but Lt. Ackerly testified that Rodriguez identified appellant by name, see id. at 242, 245 (Tr. at 291, 294)), Lt. Ackerly knew that the complaint came from appellant, was angry about it, and told O'Leary that appellant was lying. See id. at 299 (Tr. at 452).

On December 30, 1995, appellant awoke with a migraine and could not go to work. See id. at 187 (Tr. at 128). As company policy required, she attempted to contact Lt. Ackerly by calling him at work, calling his cellular phone, and paging him. See id. at 187-88 (Tr. at 128, 131). However, appellant could not reach Lt. Ackerly at the phone numbers she had.[1] As a last resort, she called the Plant directly to tell the day shift supervisor that she would not be able to come to her shift, even though she knew that company policy required her to notify Lt. Ackerly of her absence. When she returned for her next assigned day of work on January 2, 1996, appellant was given a written final warning that accused her of failing to follow the chain of command, insubordination, and violating the attendance policy by being a no-call/no-show. See

_____

[1]Lt. Ackerly never received appellant's pages because the pager number that appellant had was an old number, which had been changed. It is not clear from the record why appellant did not have Lt. Ackerly's current pager number.

id. at 413 (Appellant's Exhibit 11) (hereinafter "Ex."). In addition, Sergeant Murphy informed her that she was demoted from her acting corporal grade and told her to turn in her corporal stripes. See id. at 189 (Tr. at 133). The application of such a severe punishment for a first-time offense was a departure from appellee's progressive discipline policy which reserves such severe action as demotion in rank for serious infractions or repeat offenders. See id. at 302 (Tr. at 455).

On January 5, 1996, Lt. Ackerly issued a memorandum prohibiting "abusive and blasphemous language" on the job. See id. at 417 (Ex. 14). At trial, Lt. Ackerly testified that he issued this memo to address appellant's complaints, because Rodriguez told him that appellant was upset about the use of curse words but said nothing about sexually-explicit conversations. See id. at 242-43 (Tr. at 291-92). Sergeant Murphy spoke with each member of the B-team about the memo to see if anyone had concerns about abusive and blasphemous language and reported back to Lt. Ackerly that none of his shift members voiced any concern about abusive language. See id. at 330 (Tr. at 527). Lt. Ackerly was particularly interested in what appellant said, and instructed Sergeant Murphy to write a note that appellant did not object to foul language. See id. at 331 (Tr. at 528); see also id. at 411 (Ex. 10).

In purportedly conducting an investigation of appellant's complaints, Rodriguez visited the Plant to investigate the matter only once, and he did so during the day, even though appellant worked a night shift. See id. at 356 (Tr. at 577). He testified that he went during the day because there were other individuals who had worked with appellant and who worked during the day, and he wanted to speak to them "to get their input." Id. at 356 (Tr. at 577). Rodriguez never visited the Plant to speak to the members of appellant's shift. See id. Rodriguez never contacted appellant for more information, asked her to make a statement, or informed her of the progress of the investigation. See id. at 208 (Tr. at 194). In addition, although Rodriguez specifically recalled that appellant had complained about Sergeant Murphy, Eichhorn, and Robinson by name, he never interviewed them about the matter. See id. at 349-51, 365

(Tr. at 564-66, 598).   In fact the only member of B-Team whom Rodriguez testified he "may have" spoken to was Anderson, even though Rodriguez admitted that appellant had not complained about Anderson by name.   See id. at 352-53 (Tr. at 568-69). Moreover, a June 6, 1996, letter from one day-shift employee, David Ogburn, written at Rodriguez's request, suggests that Rodriguez was not investigating appellant's complaints, but rather appellant herself.   The letter states that Ogburn had heard appellant using foul language on the job and saying things that made others uncomfortable.[2]   See id. at 416 (plaintiff's exhibit 13).

During this same period, appellee began gathering information about appellant's actions from her co-workers and supervisors.  Following Lt. Ackerly's order to write a note about appellant's reaction to the abusive language memo, Sergeant Murphy began taking notes of his observations of appellant's behavior in order to "cover his butt."  Id. at 332 (Testimony of Murphy, Tr. 530).  On January 4, 1996, Anderson and Sergeant Murphy wrote notes claiming that appellant stated, among other things, that she was going to sue appellee.[3]  See id. at 414-15 (Ex. 12).  Appellant testified that she

---

[2]This letter reads, in part:
Dear Mr. Rodriguez:  Upon your request; I David H. Ogburn state that I have on many occasions have personally heard fellow employee Ms. Connie Blackmon use foul and abusive language while at work at our assigned location . . . On several occasions I was assigned to work with Ms. Blackmon and on every occasion heard Ms. Blackmon use foul and abusive language directed toward fellow employees in their presence and when they left the area . . . .
Id. at 416 (plaintiff's exhibit 13).

[3]Anderson's and Murphy's notes each state that January 4, 1996, appellant entered the main gate house and announced that she was suing Pinkerton and had spent the morning meeting with her lawyer and O'Leary, that she later changed her story to be that she and her boyfriend had met with O'Leary, and that later in the afternoon she informed her co-workers that her earlier statements had been a test to see if her co-workers would tell management what she said and that they had failed.  The note from

could not recall any of the purported facts contained in those notes. See id. at 191-92 (Tr. at 143-44). In addition, Rodriguez instructed O'Leary to make notes of her conversations with appellant and encouraged O'Leary to be sure those notes did not "help [appellant] in any way." Id. at 318 (Tr. at 496). Rodriguez's "investigation" and the notes and letters from Sergeant Murphy, Anderson, O'Leary, and Ogburn, support the inference that appellee was attempting to compile information in order to prove that appellant actively participated in and perhaps even caused the harassment.[4] This inference is further supported by the fact that O'Leary told appellant that if appellant were "more lady-like, [she] wouldn't have had . . . problem[s]." Id. at 200 (Testimony of appellant, Tr. at 183).

After appellant complained to Rodriguez, Lt. Ackerly restricted all members of B-Team to the main gate for breaks, which meant that they would have to order in their meals. See id. at 202 (Tr. at 185). This created further animosity between appellant and the other members of B-Team, because appellant's co-workers did not appreciate being restricted and blamed appellant for causing them to be punished. See id. In fact, Sergeant Murphy told appellant that if she "quit pissing Gene [Ackerly] off, [B-Team] wouldn't have these problems." Id. In addition, Lt. Ackerly began talking about appellant to other Firestone account employees who knew her. For example, Lt. Ackerly called Jeffrey Lierow to his office to talk about appellant. See id. at 264 (Tr. at 364). Lierow did not work on appellant's shift but knew her from their prior service in the Army. See id. Lierow testified that Lt. Ackerly warned Lierow that he had

_____

Anderson also states that he informed Lt. Ackerly that he felt their work at the plant was disrupted by lack of trust. See id. at 414-15 (Ex. 12).

[4]In fact, this was appellee's defense before the Iowa Human Rights Commission (IHRC): "[Appellant] alleges she was discriminated against on the basis of sex (female), and retaliated against for having complained of discrimination. Nothing could be further from the truth. [Appellant] was the cause of the hostile working environment [appellant] is alleging she was subjected to." Id. at 413 (Ex. 25). However, before the IHRC, appellee only addressed the issue of cursing, not the sexually-explicit conversations. See id.

-8-

better "watch his back" because "the cunt [referring to appellant] has the nerve to file sexual harassment." Id. at 265 (Testimony of Lierow, Tr. at 365).

Appellant's final problems arose in early March 1996 when she missed an assigned training session at the plant. There were two training sessions for Firestone account employees--one on March 5 and the other on March 7. See id. at 419 (Ex. 17). Appellant was assigned to the first session, but received permission from Sergeant Murphy and now-Corporal Anderson to attend the second session so she could attend a parent-teacher meeting about her son on March 5. See id. at 214-15 (Tr. at 202-03). Appellant was not the only employee to miss the first training session--Eichhorn and Robinson, both male, also failed to attend. See id. at 303 (Tr. at 465). However, when Lt. Ackerly spoke to O'Leary on March 5 he was angry only about appellant's absence and told O'Leary that he wanted appellant terminated. See id. In a separate conversation, Rodriguez told O'Leary he approved of the termination. See id. However, O'Leary told Rodriguez that they should fire all three employees who missed the training because she feared that if they only fired appellant, appellant would sue the company. See id. at 304-05 (Tr. at 468-69). As a result, Lt. Ackerly and Rodriguez ordered O'Leary to fire appellant[5] and Eichhorn.[6] See id. at 305 (Tr. at 469).

O'Leary testified that she believed that appellant was terminated because she had made a sexual harassment complaint and that Eichhorn was terminated to protect appellee from liability for firing appellant. See id. at 306-07, 314 (Tr. at 470-71, 491).

---

[5]O'Leary terminated appellant from the Firestone Account, but offered her another position on a different account. Since the new position had fewer hours and paid approximately $2.50 per hour less than the Firestone job, appellant did not accept this new offer.

[6]Eichhorn's personnel records reveal a history of serious infractions of appellee's policies, for which he had received several written warnings. This disciplinary history was far more serious than appellant's one final written warning for missing work on December 30, 1995.

Moreover, O'Leary testified that based on her experiences with sexual harassment cases as Pinkerton's human resources administrator, she believes that appellee's practice is to "get rid" of individuals who complain of harassment when there is evidence to substantiate the complaint. See id. at 307 (Tr. at 471).

Appellant filed a complaint in federal district court alleging sexual harassment and retaliation claims in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and Iowa Code Chapter 216 et seq. After a four-day trial, the jury found in favor of appellant and awarded her compensatory damages in the amounts of: $3,460.00 for lost wages, $30,000.00 for emotional distress for the sexual harassment claim, and $45,000.00 for emotional distress for the retaliation claim. The jury also awarded appellant $100,000 in punitive damages. The district court entered the award on March 27, 1998. Subsequently, appellee moved for judgment as a matter of law (JAML), arguing that appellant failed to prove her allegations of sexual harassment and retaliation, and for new trial, arguing that the damages awarded by the jury were excessive, and appellant moved for attorney's fees and costs. The district court denied appellee's motion for new trial and its JAML motion on all issues but punitive damages. See Order at 2. The district court granted appellee's JAML motion on the issue of punitive damages, finding that appellant's case fell "just short of supporting the $100,000 punitive damages verdict." Id. Accordingly, the district court withdrew the $100,000 punitive damages award. The district court also awarded appellant $37,500 in attorney's fees and $2,938.18 in costs. See id. at 3. The district court entered a final judgment in the amount of $119,798.18 for appellant on June 4, 1998. See id. Appellant appeals the district court's order granting JAML on the punitive damages issue in favor of appellee.

DISCUSSION

We review the district court's grant of judgment as a matter of law (JAML) de novo. See, e.g., Bailey v. Runyon,167 F.3d at 468. "[B]ecause the law places a high standard on overturning a jury verdict, JAML is proper '[o]nly when there is a complete absence of probative facts to support the conclusion reached' so that no reasonable juror could have found for the nonmoving party." Id. (citing Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir.1997) (internal citations omitted)). We will affirm the grant of JAML only "when all the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict." Id. (internal citations omitted).

A plaintiff bringing a Title VII employment discrimination claim may recover punitive damages under 42 U.S.C. § 1981a(b)(1) if he or she can prove that the employer acted with malice or reckless indifference to his or her federally protected rights. See Kolstad v. American Dental Ass'n, No. 98-208, 1999 WL 407481, at *6 (June 22, 1999); Howard v. Burns Bros., Inc., 149 F.3d 835, 843 (8th Cir. 1998); Browning, 139 F.3d at 636; Summit v. S-B Power Tool, 121 F.3d 416, 422-23 (8th Cir. 1997); Varner v. National Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996); see also Kim v. Nash Finch, 123 F.3d 1046, 1066 (8th Cir. 1997)(punitive damages are available under Title VII under the same standard as under 42 U.S.C. § 1981). In light of the facts recounted above, we are convinced that there was sufficient evidence to support the jury's determination that appellee acted with malice or reckless indifference to appellant's federally protected rights, and as such the district court erred in granting JAML on the punitive damages issue for appellee.

To summarize the facts detailed above, appellee acted with malice and reckless indifference to appellant's federally protected rights when it: (1) failed to investigate appellant's complaints and institute prompt remedial action even after appellant complained to three successive levels of supervision; (2) repeatedly retaliated against her for complaining of sexual harassment by reprimanding her, demoting her, fostering

-11-

an environment in which her co-workers were openly hostile to her, and finally terminating her; (3) attempted to escape legal liability by soliciting information against appellant to prove she caused the harassment[7]; and (4) attempted to escape legal liability for terminating appellant by firing another employee at the same time.

We further note that appellee's supervisory employees, Sergeant Murphy and Lt. Ackerly, were active participants in the sexual harassment.

The district court granted JAML because appellant suffered no physical injury, the harassing situation did not continue for an unusually long period of time, appellee took some action, and because appellee did not terminate appellant's employment but rather transferred her. See Order at 2. On appeal, appellee contends that the district court did not err because appellee's conduct was limited in time and did not constitute "extraordinary circumstances." Although we have considered physical injury and duration of harassment to be relevant factors when determining the appropriateness of punitive damages, see, e.g., Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 575-76 (8th Cir. 1997), evidence of these factors is not required to prove an employer acted with malice or reckless indifference to the plaintiff's federally protected rights.

Although appellant was not physically assaulted by her co-workers or supervisors and did not present evidence that she suffered physical injuries, she was nonetheless injured by the incessant sexually explicit comments, her co-workers' and supervisors' hostile attitude, and the punishment her superiors meted out to her for

_____

[7]We do not hold that employers cannot include information about complaining employees in their investigations or consideration of complaints of harassment or discrimination or both. Such information can be helpful in an even-handed, good-faith investigation. However, in this case appellee did not conduct an even-handed, good-faith investigation, in which information about appellant was but a part. Appellee's investigation consisted almost exclusively of looking for unfavorable information about appellant. Under these circumstances, the collection and use of information against appellant demonstrated malice or reckless indifference to her federally protected right to be free from retaliation.

-12-

complaining about the sexual harassment. Appellant testified that the harassment, retaliation, and appellee's failure to stop the harassment caused her substantial mental and emotional anguish, including isolation, inability to sleep, hopelessness, and sadness and pain which caused her to "cry [herself] to sleep." App. at 220 (Tr. at 220). This is sufficient injury to warrant submission of the issue of punitive damages to the jury in a Title VII sexual harassment case.[8] It is true that we have not required consideration of punitive damages in all cases where there was actual physical contact between the harasser and the victim, see, e.g., Varner v. National Super Markets, Inc., 94 F.3d at 1214 (district court's failure to submit punitive damages issue to jury was not improper in case where harasser twice grabbed victim's breasts and forced her hand onto his crotch), but that does not mean that sexual harassment that does not involve physical contact is per se less serious.

Similarly, the fact that the sexual harassment appellant suffered, in the district court's opinion, did not occur for a "shockingly long period of time" does not preclude punitive damages. Order at 2. Appellant was subjected to daily sexual harassment for five months. The sheer intensity and frequency of the harassment during those five months and the severe retaliation she suffered, particularly in light of her frequent, unsuccessful complaints to successive levels of supervisors, supports the jury's award. Furthermore, a durational requirement in inappropriate, particularly where retaliation is also alleged; here, under such a standard, appellee could escape punitive damages because it cut "short" the harassment by firing appellant. Appellant testified that the sexually explicit conversations continued up until the day she was terminated, despite her complaints to three levels of supervisory employees. See App. at 210 (Tr. at 196).

---

[8]Actual physical injury is not required and could produce absurd results. For example, an employer could escape punitive damages even in extreme cases of harassment (such as the harasser repeatedly exposing him or her self to the victim, making suggestive gestures, or, as in this case, carry on non-stop sexually-explicit conversations) as long as the harasser did not touch the victim or as long as the victim were resistant to stress-induced physical injuries such as ulcers.

-13-

Appellee's decision to "get rid" of appellant in March 1996, rather than at a later date, should not protect it from punitive damages liability.

We also disagree with the district court's assessment that appellee's minimal action to address appellant's concerns was sufficient to overturn the jury's determination that appellee's actions warranted punitive damages. Rodriguez's "investigation" of appellant's complaint was clearly inadequate and disproportionate to the seriousness of appellant's complaints. Appellee's only remedial action--the abusive and blasphemous language memo--did not address the crux of appellant's complaint--that her co-workers were sexually harassing her by engaging in constant, lurid, sexually-explicit conversations in her presence. Furthermore, we take note of appellee's actions to limit its liability by investigating appellant rather than the harassment and by simultaneously firing a male employee, Eichhorn. Once again we recite the well-established principle that an employer can escape legal liability for sexual harassment by promptly investigating complaints and instituting effective remedial action. See, e.g., Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999). However, we do not consider appellee's half-hearted responses to appellant's serious complaints of sexual harassment to satisfy this obligation.

Finally, we believe the punitive damages award is warranted in this case to achieve the "twin policy objectives of . . . punishment and deterrence." Denesha v. Farmers Ins. Exch., 161 F.3d at 503 (citing EEOC v. HBE Corp., 135 F.3d 543, 556 (8th Cir. 1998)).

CONCLUSION

We hold that the district court erred in granting judgment as a matter of law on the issue of punitive damages. We affirm the part of district court's judgment on compensatory damages, but reverse the part of its judgment on punitive damages, and remand the case to the district court with directions to reinstate the jury's $100,000.00 punitive damages award.

-14-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.