# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3759
No. 98-3760

_____

Mark S. Welfl,

    Appellant\Cross-Appellee,

v.

Northland Insurance Company,

    Appellee/Cross-Appellant

\*
\*
\*
\*
\*
\*   Appeal and Cross-Appeal from the
\*   United States District Court for the
\*   District of Nebraska.
\*
\*

_____

Submitted: June 18, 1999

Filed: October 7, 1999

_____

Before RICHARD S. ARNOLD and ROSS, Circuit Judges, and BYRNE,[1] District
    Judge.

_____

ROSS, Circuit Judge.

    Mark S. Welfl appeals from a judgment of the district court[2] granting judgment
as a matter of law (JAML) in favor of Northland Insurance Company on his breach of

---

[1]The Hon. William Matthew Byrne, Jr., Senior United States District Judge for
the Central District of California, sitting by designation.

[2]The Hon. William G. Cambridge, Chief Judge, United States District Court for
the District of Nebraska.

contract and bad faith tort claims. We affirm.

Welfl, a Nebraska resident, was an independent livestock hauler. He insured a 1990 Peterbilt tractor, a 1993 Merritt trailer, and a 1995 Wilson trailer with Northland, a Minnesota corporation. The policy provided that at Northland's option it could "[p]ay for, repair or replace damaged . . . property." The policy also provided that the most Northland was obligated to pay was the lesser of the insured amount, the actual cash value of the property at the time of the loss, or the "cost of repairing or replacing the damaged . . . property with other of like kind or quality."

Welfl had purchased the Wilson trailer, which is the subject of this dispute, on September 4, 1994, for $45,500 and insured it for $45,000. About one week later, he ran off a highway in Wyoming, causing extensive damage to the tractor and the trailer. Welfl, who had been taken to the hospital, contacted his wife Kathy and instructed her to notify Northland of the accident. That night Kathy reported the accident on the company's hotline. The next day after Kathy talked to Charles Pinska, a Northland claims examiner, and Max Hungate, an independent insurance adjuster Northland had hired to investigate the claim, she agreed that the damaged units could be towed to Denver, Colorado. Later that day the tractor was towed to a Peterbilt dealership and the trailer was towed to a Wilson dealership.

After discussing the damage to the units with the dealerships, Hungate estimated repairs to the tractor, which had been insured for $47,000, would cost $49,506, and repairs to the trailer would cost $29,889.21. He also estimated it would take about 335 hours to repair the trailer. By letter of September 29, 1994, he forwarded the estimates to Pinska, who declared the tractor a total loss. According to Pinska, because the repair estimate of the trailer was "getting up there," he instructed Hungate to obtain three salvage bids on it. In deciding whether to total an insured unit, Pinska compared the cost of repairs plus the salvage value to the lesser of the insured amount, actual cash value, or replacement cost. Pinska believed because the trailer was one week old at

the time of the accident, it was reasonable to use the insured amount of $45,000 as the actual cash value and the replacement cost of the trailer. Pinska did not declare the trailer a total loss because, after deducting an $800 tow charge, the repair estimate of $29,089.21 plus a $10,000 salvage bid was less than $45,000. On October 10, Pinska mailed a check for the repairs and the tow charge to Welfl.

After Welfl received the check, Joe DeCola, the general manager of the Wilson dealership where the trailer had been towed, worked with him to get his "okay to repair the trailer." Welfl, who was undecided as to repairs, refused to come to the dealership to go over the estimated repairs, as DeCola requested. In fact, before receiving the check, Welfl negotiated with DeCola for a trade. In order to get "things moving," on September 27 DeCola had offered Welfl $11,000 as salvage for the trailer and to sell him another trailer for $43,578.16, which was as close as DeCola could come to duplicating the Wilson trailer. Welfl did not take the salvage offer or purchase another trailer. Instead, on November 29, he authorized repairs on the damaged trailer.

Welfl continued to haul cattle, using another tractor and the Merritt trailer. However, he sold the trailer at the end of January, believing the Wilson trailer would be repaired by then. Due to a parts delay, Welfl was unable to pick up the Wilson trailer until March, and when he loaded the trailer, it did not operate properly. In April Northland arranged for Welfl to take the trailer to the Wilson plant, where additional repairs were made. Northland paid $1898 for the repairs.

From the end of January, Wilson did not work and fell behind on his payments on the Wilson trailer, which he sold back to the dealer to avoid repossession. In May 1995, Welfl considered suicide and was hospitalized with a diagnosis of bipolar disorder. At the time of the May 1998 trial he had not returned to work.

At trial, Welfl introduced evidence that Hungate's time records did not reflect that he had solicited salvage bids or had determined a replacement cost or actual cash

value for the trailer and that the only evidence in Northland's file concerning salvage bids was a 1995 document. Welfl also presented the testimony of Garth Allen, an insurance professor. Allen testified that Northland had breached its policy with Welfl by conducting an inadequate investigation, failing to supervise the repair process, and failing to pay the costs of repair in a timely fashion. He also stated that under the insurance contract Northland had an implied duty of good faith and fair dealing which required it to put Welfl's interests ahead of its own and believed Northland had breached the duty by choosing to repair the trailer, instead of replacing it, especially considering that the estimate included eight weeks of repair time. Allen also believed that Northland had acted in bad faith by demonstrating an intentional or reckless disregard of Welfl's rights and interests.

Welfl's counsel argued to the jury that had Hungate properly investigated the claim he would have determined that the salvage value of the trailer was $11,000 and the replacement value was $43,578.16 and that adding the salvage value to the costs of the two repairs was $41,987.21, which was about $1590 less than the replacement cost of the trailer. Counsel further argued that given the difference and the fact that the repair estimate included eight weeks of down time, Northland should have paid for replacing the trailer instead of paying for repairs.

The jury returned verdicts in favor of Welfl on the breach of contract claim for $13,212.79 and on the bad faith tort claim for $2,650,000. Northland filed a post-trial motion for JAML, see Fed. R. Civ. P. 50(b), asserting there was insufficient evidence to support the verdicts. Applying Nebraska law, which governs this case, the district court agreed and set aside the verdicts.

"We review the district court's grant of judgment as a matter of law (JAML) de novo." Blackmon v. Pinkerton Sec. & Investigative Serv., 182 F.3d 629, 635 (8th Cir. 1999). "We will affirm the grant of JAML only 'when all the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict.'

" Id. (quoting Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997)). In reviewing the evidence, we have considered it and all reasonable inferences therefrom in the light most favorable to Welfl. See id. at 630.

Welfl argues that the district court erred in granting JAML on the contract claim because his evidence was that Northland breached its policy by conducting an inadequate investigation because it failed to obtain salvage and replacement values. Even giving Welfl the benefit of reasonable inferences from the evidence, we have some doubt that DeCola's offer to sell him a trailer for $43,578 established a replacement cost of a trailer of "like kind or quality," as the policy required. DeCola only testified that the trailer offered for sale was as close as he could get to the damaged trailer and Welfl did not purchase it, but for purposes of this appeal we will assume the offer established replacement cost. However, as Welfl argued to the jury, the sum of the salvage value plus the total of the repair costs was about $1590 less than the replacement cost. He does not dispute that "[t]he parties to an insurance contract may contract for any lawful coverage, and an insurer may limit its liability and impose restrictions and conditions upon its obligation under the contract not inconsistent with public policy or statute." American Family Ins. Grp. v. Hemenway, 575 N.W.2d 143, 148 (Neb. 1998). However, contrary to Welfl's suggestion on appeal, "[i]n appellate review of an insurance policy, the policy must be construed as any other contract and effect must be given to the parties' intentions at the time the contract was made." Id.; see also Farm Bureau Ins. Co. v. Bierschenk, 548 N.W.2d 322, 325 (Neb. 1996) ("insurance is a matter of contract, not sympathy"). "Where the terms of such a contract are clear, they are to be accorded their plain and ordinary meaning." Hemenway, 575 N.W.2d at 148. Here, the policy unambiguously stated that all Northland was obligated to pay was the lesser of the repair or replacement cost. Thus, there is no evidence that Northland breached an express policy provision.

Welfl goes on to argue that the district court erred in granting JAML on his contract claim because there was evidence that Northland had breached the implied

-5-

duty of good faith and fair dealing. He asserts that the duty requires an insurance company to put an insured's interests ahead of its own, and Northland breached the duty by failing to take into account the estimated eight weeks to repair the trailer in deciding whether to repair or replace it. Although in Nebraska "[t]he implied covenant of good faith and fair dealing exists in every contract[,]" it "requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract." Cimino v. FirsTier Bank, 530 N.W.2d 606, 616 (Neb. 1995). In other words, as this court has stated, "[a]cting according to express terms of a contract is not a breach of good faith and fair dealing." Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 983 (8th Cir. 1991) (applying Nebraska law). Although Welfl argues that the implied duty of good faith required Northland to pay the greater of the cost of repair or replacement, he is mistaken. "Where parties expressly contract under what circumstances an obligation may arise with reference to a certain subject-matter, . . . [the contract provision] excludes the possibility of an implied covenant of a contradictory or different nature." Crete Mills v. Smith Baking Co., 286 N.W. 333, 337 (Neb. 1939) (internal quotation omitted); see also Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir. 1996) (implied duty of good faith "cannot give rise to new obligations not otherwise contained in a contract's express terms") (applying Missouri law). Here, because Northland was acting "in accord with the specific terms of the contract, there can have been no violation of Nebraska's implied covenant of good faith and fair dealing." Smith v. Lozier Corp., 140 F.3d 765, 767 (8th Cir. 1998).

In any event, we do not believe there was evidence that Northland put its interests ahead of Welfl. Pinska testified that Northland sends a check to the insured because the insured is in the best position to know what his needs are. For example, Pinska explained that an insured could "total" a vehicle himself by soliciting higher salvage bids and lower replacement costs. Indeed, Welfl attempted to negotiate to buy a replacement trailer. After Northland mailed him the check for the repairs on October 10, it was Welfl's decision whether to repair the damaged trailer or sell it for salvage

and purchase a new one. We also note that although Welfl claims Northland should have taken into account the estimated eight weeks of repair time in deciding whether to repair or replace the trailer, Welfl, who did not purchase business interruption insurance, delayed authorizing repairs for six weeks and continued to haul cattle in the Merritt trailer, which he sold before the repairs on the Wilson trailer were completed.

Because there is no evidence that Northland denied Welfl any benefit due under the insurance contract, the district court did not err in granting JAML on the bad faith tort claim. See Braesch v. Union Ins. Co., 464 N.W.2d 769, 777 (Neb. 1991) ("To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the [insurance] policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.") (internal quotation omitted). Thus, we do not consider Northland's cross-appeal concerning the bad faith instruction.

Accordingly, we affirm the district court's judgment and dismiss the cross-appeal as moot.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT