# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 99-4082/4083

_____

| | | |
|---|---|---|
| Linda Fletcher, | * | |
| | * | |
| Appellant/Cross-Appellee, | * | Appeals from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Arkansas |
| | * | |
| Price Chopper Foods of Trumann, Inc., | * | [PUBLISHED] |
| | * | |
| Appellee/Cross-Appellant | * | |

_____

Submitted:  June 12, 2000

Filed:  August 9, 2000

_____

Before WOLLMAN, Chief Judge, McMILLIAN, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

A jury found that Price Chopper Foods of Trumann, Inc. (PCF) intruded upon the seclusion of its former employee, Linda Fletcher.  The jury awarded Fletcher both compensatory and punitive damages.  After trial, PCF sought judgment as a matter of law as to both the underlying tort claim and the award of punitive damages.  The district court denied PCF's motion for judgment on the tort claim, but granted the motion as to the punitive damages award.  PCF appeals the denial of its motion for judgment on the tort claim; Fletcher appeals the district court's dismissal of her punitive damages award.  We reverse in part and affirm in part.

## FACTUAL BACKGROUND

Because Fletcher prevailed at trial, we view the factual record in the light most favorable to her. We also give Fletcher the benefit of all reasonable inferences from the trial record. See White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992) (citing Dace v. ACF Indus., Inc., 722 F.2d 374, 375-76 (8th Cir. 1983)).

PCF operates a grocery store in Trumann, Arkansas. Fletcher began work for PCF as a deli cook in June 1993. In May 1995, Fletcher was diagnosed with diabetes. By August 1996, Fletcher's diabetic condition had deteriorated to the point that her left leg had to be amputated below the knee. At that time, Fletcher ceased working for PCF and rehabilitated her leg.

In March 1997, Fletcher returned to work in the same position at PCF. But in July 1997, Fletcher developed a diabetic ulcer in her right foot. Fletcher's foot ulcer required treatment and dressing at a hospital three times per week. On September 29, 1997, Fletcher spilled hot gravy on her right foot — the foot suffering from the diabetic ulcer. A co-worker assisted Fletcher in removing her sock and placed burn cream on the exposed portion of her foot. As part of company policy, Fletcher then completed and signed an Arkansas Workers' Compensation form.[1] That form contained an authorization that permitted the release of Fletcher's medical information.

In early October 1997, Fletcher learned that her right foot had developed a staph infection. Fletcher immediately informed two coworkers of her condition; coworkers eventually conveyed the information to the local store manager. PCF's corporate manager, Marlene Sawyer, testified that she decided to terminate Fletcher's employment that evening because Arkansas health regulations forbid persons infected

---

[1]Although she completed the accident report form, Fletcher never made a claim under the workers' compensation laws.

with a communicable disease (such as staph) from working in the food preparation industry.[2] Sawyer also admitted, however, that she viewed Fletcher as an "insurance risk" due to Fletcher's prosthetic limb and decreased mobility.

Following her termination, Fletcher applied for state unemployment benefits in Arkansas. In her application, Fletcher claimed that she did *not* have a staph infection at the time PCF terminated her employment. When Sawyer learned of Fletcher's claim that she had not been infected with staph, Sawyer decided to resolve the inconsistency in Fletcher's story.

Sawyer contacted Fletcher's doctor to ascertain whether Fletcher in fact had a staph infection. Sawyer spoke to Nurse Flemon, who informed Sawyer that such information could not be conveyed without a medical authorization form. According to Flemon, Sawyer responded that PCF employees sign medical information waivers when they begin work at PCF. Sawyer agreed to fax to the doctor's office a copy of Fletcher's authorization. Sawyer proceeded to fax a copy of Fletcher's *workers' compensation form* that contained a medical authorization. Sawyer also informed Nurse Flemon that, on one occasion, Fletcher had removed the bandage from her foot during work. Flemon interpreted Sawyer's remarks to mean that Fletcher had exposed her infection to the air, an act proscribed by Fletcher's doctor. Based on this information, Fletcher's doctor wrote to Sawyer informing her that Fletcher was indeed infected with the staph virus. The doctor reiterated that Fletcher should not remove her bandages.

---

[2]See Ark. Dept. of Health Regs., Food Serv. Establishments § 3-101 (effective Oct. 28, 1993). Although the regulations promulgated by the Department have the force of law, see Ark. Code Ann. § 20-7-109(a)(1) (Michie 2000), the regulations are not formally published.

In portions of Sawyer's deposition read at trial, Sawyer acknowledged that she did not really need to know whether Fletcher had a staph infection. She stated simply that she wanted to "soothe the fears" of the "other ladies in the store." But on cross-examination, Sawyer added to her explanation, claiming that she needed to know whether Fletcher was infected with staph in order to determine whether Fletcher could return to work in the PCF deli.

## PROCEDURAL HISTORY

On December 16, 1998, Fletcher filed a complaint against PCF alleging discrimination on the basis of disability under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213. On September 8, 1999, the district court permitted Fletcher to amend her complaint to add two state-law tort claims, invasion of privacy and outrage. On October 5, 1999, the court granted PCF's motion for summary judgment on the outrage claim, but denied the motion as to Fletcher's ADA claim. The court declined to rule on the invasion of privacy claim at that juncture.

The parties tried the ADA and invasion of privacy claims to a jury on October 6-7, 1999. At the close of Fletcher's case-in-chief, PCF moved for judgment as a matter of law, which the district court denied. The jury ultimately found PCF liable on the state-law invasion of privacy claim, but not liable on the ADA claim. The jury awarded Fletcher $5,000 in compensatory damages and $50,000 in punitive damages. After trial, PCF renewed its motion for judgment as a matter of law as to both the punitive damages award and the invasion of privacy claim. On October 13, 1999, the court granted the motion as to the punitive damages component, but denied the motion as to the underlying claim of invasion of privacy.

Fletcher timely appealed the dismissal of her punitive damages award; PCF timely cross-appealed the denial of its motion for judgment as a matter of law on the invasion of privacy claim.

-4-

# DISCUSSION

A party who moves for judgment as a matter of law before the case is submitted to the jury may later "renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment." Fed. R. Civ. P. 50(b). The trial court then has discretion to grant or deny the motion, or order a new trial. See Fed. R. Civ. P. 50(b)(1)(A)-(C).

We review de novo both grants and denials of motions for judgment as a matter of law using the same standard as the district court. See Welfl v. Northland Ins. Co., 192 F.3d 1169, 1172 (8th Cir. 1999) (grant); McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994) (denial). We must ascertain "whether there is sufficient evidence to support a jury verdict. The panel must analyze the evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." White, 961 F.2d at 779 (citation omitted). In sum, we review the district court's decision to grant or deny judgment as a matter of law with great deference to the jury's verdict. See Mears v. Nationwide Mut. Ins. Co., 91 F.3d 1118, 1121 (8th Cir. 1996).

## A.    Invasion of Privacy

Arkansas first recognized the tort of invasion of privacy in Olan Mills, Inc. v. Dodd, 353 S.W.2d 22 (Ark. 1962), and Dodrill v. Arkansas Democrat Co., 590 S.W.2d 840 (Ark. 1979). In Dodrill, the Arkansas Supreme Court adopted the approach set forth in the Restatement (Second) of Torts, which delineates four separate torts grouped under the rubric "invasion of privacy":

(1)    unreasonable intrusion upon the seclusion of another;
(2)    appropriation of the other's name or likeness;
(3)    unreasonable publicity given to the other's private life; and

(4)     publicity that unreasonably places the other in a false light before the public.

See Dodrill, 590 S.W.2d at 844.

Fletcher proceeded under the first of these torts, intrusion upon seclusion. Although the Arkansas courts have seldom adjudicated intrusion upon seclusion claims, their analysis of this particular privacy tort would likely follow the Restatement's discussion. See Alexander v. Pathfinder, Inc., 189 F.3d 735, 742 (8th Cir. 1999). The Restatement defines liability for intrusion upon seclusion as follows:

> One who intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).

The tort consists simply of three parts: (1) an intrusion (2) that is highly offensive (3) into some matter in which a person has a legitimate expectation of privacy. See, e.g., Williams v. American Broad. Cos., Inc., 96 F.R.D. 658, 669 (W.D. Ark. 1983) (applying Arkansas law) ("This tort requires actions on the defendant's part in the nature of prying or intrusion which is offensive or objectionable to a reasonable person. The 'thing' into which there is intrusion or prying must be, and be entitled to be, private.").

**1.     Intrusion**

An intrusion occurs when an actor "believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act." O'Donnell v. United States, 891 F.2d 1079, 1083 (3d Cir. 1989) (applying § 652B of

the Restatement per Pennsylvania law).  The trial record leaves little doubt that Sawyer intruded.

Sawyer used a medical authorization from a workers' compensation form to gain information about Fletcher's staph infection.  Yet Fletcher never sought workers' compensation benefits; indeed, at the time of Sawyer's inquiry, Fletcher pursued a claim for unemployment benefits, not workers' compensation.  PCF's contention that the workers' compensation medical authorization was "good for all purposes" strains credulity.[3]

Furthermore, the jury could have found (and likely did find) that Sawyer misrepresented to Nurse Flemon the nature of Fletcher's behavior at work.  Nurse Flemon recalled during her testimony that Sawyer told her Fletcher had removed a bandage from her foot ulcer in violation of her doctor's orders.  Yet the testimony about Fletcher's behavior on the day she spilled gravy on her foot was equivocal at best.  The jury could easily have determined that Fletcher did *not* remove her bandage, since Fletcher so testified.  Sawyer's conduct was intrusive.

### 2.  Highly offensive

Fletcher introduced evidence that Sawyer obtained information about her staph infection by subterfuge.  Fletcher equates subterfuge with "highly offensive" conduct.  In interpreting § 652B of the Restatement, the Kansas Supreme Court has held that unauthorized release of medical information does *not* constitute highly offensive conduct when that information could otherwise have been obtained by proper means.  See Werner v. Kliewer, 710 P.2d 1250, 1255-56 (Kan. 1985).

---

[3]PCF did not cite (and we could not locate) any Arkansas authority to support this remarkably broad proposition.

In <u>Werner</u>, a husband urged his wife's physician to send a letter to the trial court disclosing the wife's suicidal attempts and behavior in the midst of divorce and child custody proceedings. The wife sued her physician for intrusion upon seclusion because the physician wrote the letter without her consent. The Kansas Supreme Court upheld a grant of summary judgment in favor of the physician on the intrusion claim, holding that "there is nothing in the letter which was not already known by her husband. . . . although it would have been preferable to have followed standard court and discovery procedures, the information revealed, under the circumstances of this case, certainly does not rise to the level of being highly offensive to a reasonable person." <u>Id.</u>

Like the husband and physician in <u>Werner</u>, Sawyer could have employed proper means to discover whether Fletcher actually had a staph infection at the time of her discharge. During her rebuttal argument, Fletcher's counsel conceded that PCF could have obtained a subpoena for the doctor's testimony during Fletcher's unemployment benefits application process. That concession comports with our understanding of Arkansas unemployment benefits law: PCF would have had an opportunity (perhaps even a duty) to subpoena Fletcher's doctor. <u>See, e.g.</u>, <u>Sanyo Manufac. Corp. v. Stiles</u>, 702 S.W.2d 421, 423 (Ark. Ct. App. 1986) (recognizing an employer's right to request subpoenas of employees' doctors to determine whether employees were medically restricted from working); <u>see also</u> Ark. Employ. Sec. Reg. 15(A) (last visited June 28, 2000) <www.state.ar.us/esd/reg15.html>[4] ("Two [2] copies of the notice of an initial or additional claim filed [by claimant] shall be mailed . . . to . . . his last employer. This notice shall request that the employer *immediately furnish* pertinent information to the Employment Security Division.") (emphasis added).

---

[4]Although the regulations promulgated by the Arkansas Employment Security Division have the force of law, <u>see</u> Ark. Code Ann. § 11-10-521(a) (Michie 1996), the regulations are not formally published. We therefore refer to the Division's internet website for the text of these regulations.

Because Sawyer might have availed herself of proper discovery means — even though she did not — we conclude as a matter of law that Sawyer's conduct was not highly offensive. See Werner, 710 P.2d at 1255-56. Fletcher urges a contrary conclusion and refers us to an illustration in § 652B. Illustration 4 prescribes liability for one who procures evidence to use in a civil suit by forging a court document to obtain confidential bank records of his adversary. See Restatement (Second) of Torts § 652B, cmt. b, illus. 4 (1977). Illustration 4 does not foreclose our decision, however, because the felonious conduct of the actor in the hypothetical is qualitatively different from Sawyer's conduct. While we readily acknowledge that Sawyer's conduct was morally reproachable, her conduct does not rise to the level of forgery, a felony. Hence Sawyer's decision to bypass proper channels in obtaining information from Fletcher's doctor does not bring her conduct within the ambit of Illustration 4.

Fletcher therefore failed to adduce sufficient evidence at trial to permit a jury to conclude that Sawyer intruded in a highly offensive manner.

### 3. Expectation of Privacy

We also find that Fletcher failed to establish the third element of her intrusion claim — privacy. At trial, Fletcher asserted a privacy interest in the medical fact that she was infected with the staph virus at the time of her termination. PCF acknowledges that, as a general matter, an individual's medical records are private. But PCF contends that Fletcher's behavior, coupled with the circumstances surrounding her termination, failed to demonstrate an intent to maintain privacy in the information.

A legitimate expectation of privacy is the touchstone of the tort of intrusion upon seclusion. "[T]he plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy." Hill v. National Collegiate Athletic Ass'n, 865 P.2d 633, 648 (Cal. 1994). In Hill, student-athletes at Stanford University sued the National Collegiate Athletic Association

(NCAA) under the privacy clause of the California Constitution to enjoin the NCAA from conducting random drug tests. Although the plaintiffs did not plead a cause of action for intrusion upon seclusion, the California Supreme Court looked to the four common law invasion of privacy torts for guidance in interpreting the scope of the state constitutional privacy guarantee. After concluding that the invasion of privacy torts promised significant protection to individuals, the Court discerned "several important limiting principles that have prevented [the common law rights of privacy from] becoming an all-encompassing and always litigable assertion of individual right." Id. at 647-48. Chief among these "limiting principles" is the notion that a person's behavior may give rise to an inference that he no longer expects to maintain privacy in some aspect of his affairs. See id. at 648. Fletcher's case implicates this notion.

Fletcher's behavior did not indicate that she intended to keep knowledge of her staph infection private. When Fletcher learned that she had a staph infection, she informed two coworkers of her condition. Fletcher's revelation of private information to coworkers eliminated Fletcher's expectation of privacy by making what was formerly private a topic of office conversation. See Moffett v. Gene B. Glick Co., Inc., 621 F. Supp. 244, 283 (N.D. Ind. 1985) (applying § 652B of the Restatement per Indiana law).

In Moffett, a white female suffered repeated sexual and racial taunts from several coworkers because she dated a black man. Moffett's supervisor also removed items from her desk and attempted to eavesdrop on her conversations with her boyfriend. The court acknowledged that Moffett's coworkers and supervisor intentionally interfered with her personal affairs. Yet the court dismissed Moffett's intrusion claim because she failed to demonstrate adequate "seclusion." Moffett admitted that she had discussed her interracial relationship with her coworkers. The court found that "[b]y discussing that relationship in the office environment, [Moffett] cannot now claim some kind of solitude or seclusion for the relationship in that environment." Id. at 283.

-10-

Moffett suggests that even extraordinarily offensive conduct may not be redressed via the tort of intrusion upon seclusion unless a plaintiff demonstrates a legitimate expectation of privacy. Much like the plaintiff in Moffett, Fletcher lost her expectation of privacy when she shared knowledge of her staph infection with coworkers.

The timing of Fletcher's disclosure to her fellow coworkers also suggests she did not intend to keep the knowledge of her staph infection to herself. Fletcher testified that the first thing she did upon learning that she was infected was to inform her coworkers. One who seeks to maintain privacy in a newly-discovered piece of information does not immediately reveal that information to others. Fletcher's actions do not indicate a subjective expectation of privacy.

The testimony at trial also revealed that Sawyer knew of Fletcher's staph infection before she contacted Nurse Flemon for confirmation. After Fletcher informed her coworkers of her condition in early October 1997, news of Fletcher's malady spread. By the end of the day, both Fletcher's immediate supervisor (on-site at PCF) and Sawyer (a corporate manager in another town) knew that Fletcher had been diagnosed with a staph infection. In her testimony, Fletcher acknowledged that her staph infection was one reason why Sawyer decided to terminate her employment.[5] The proverbial cat had escaped from the bag long before Sawyer contacted Fletcher's doctor. Viewed objectively, then, Fletcher's expectation of privacy was unreasonable.

---

[5]Sawyer also told Fletcher that she was an "insurance risk" due to her prosthetic limb and decreased mobility. Poor mobility apparently posed a considerable risk because the PCF deli contained some broken or poorly-maintained equipment. We acknowledge that the jury could reasonably have concluded that Sawyer fired Fletcher for these reasons, not because of the staph infection. Even viewing the record in Fletcher's favor, however, Sawyer knew of Fletcher's staph infection at the time of Fletcher's termination. *Sawyer's knowledge* is the critical issue in assessing Fletcher's expectation of privacy.

More fundamentally, Fletcher's staph infection significantly impacted her fitness to work at PCF. Employees infected with communicable diseases may not, as a general matter, work in the food service industry. Cf. 42 U.S.C. § 12113(d)(2) (providing that a food-industry employer may refuse to employ an individual with an infectious or communicable disease without violating the ADA); 1999 Food & Drug Admin. Model Food Code ¶ 2-201.12(A) ("The person in charge shall exclude a food employee from a food establishment if the food employee is diagnosed with an infectious agent specified under ¶ 2-201.11") (last modified Feb. 27, 1999) <http://vm.cfsan.fda.gov/~dms/fc99-toc.html>. It is beyond dispute that the staph virus has the potential to infect others. Hence Fletcher's medical condition was a matter of legitimate concern to PCF, since her staph infection jeopardized her future employment at PCF. When such concern for the public health exists, an employer's need to know trumps an employee's right to privacy. Cf. Eddy v. Brown, 715 P.2d 74, 77 (Okla. 1986) (interpreting § 652B of the Restatement) (holding that an employee may not claim a privacy interest in medical information probative of that employee's fitness or capacity to work).

For all of these reasons, we conclude that Fletcher lacked a reasonable expectation of privacy with respect to knowledge of her staph infection. As a matter of law, the jury could not reasonably conclude that Fletcher established "seclusion."

## B.     Punitive Damages

The jury awarded Fletcher $50,000 in punitive damages. After the verdict was entered, the district court granted PCF's motion for judgment as a matter of law because "there was insufficient evidence for a factual finding that defendant was guilty of 'extra-ordinary conduct' or that plaintiff's privacy was invaded with malice or calloused indifference." Order of October 13, 1999.

Under Arkansas law, punitive damages are available only when a plaintiff first obtains compensatory damages.  See Hale v. Ladd, 826 S.W.2d 244, 247 (Ark. 1992) (citations omitted). Because we reverse Fletcher's compensatory damages award, *supra*, Fletcher is not entitled to punitive damages.

**DISPOSITION**

We *reverse* the district court's denial of PCF's motion for judgment as a matter of law on the invasion of privacy claim.  We *affirm* the district court's grant of PCF's motion for judgment as a matter of law on the punitive damages award.


McMILLIAN, Circuit Judge, concurring specially.

I agree that Fletcher failed to establish the third element of her invasion of privacy claim because she failed to demonstrate an intent to keep knowledge about her staph infection private.  After learning from her doctor that she had a staph infection, Fletcher told two coworkers about it.  Such a disclosure is inconsistent with an intent to maintain privacy.  For that reason, I concur in the decision to reverse the denial of judgment as a matter of law on the invasion of privacy claim and, given the reversal of the compensatory damages award, to affirm the grant of judgment as a matter of law on punitive damages.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-