WAL-MART STORES, INC. *v.* Andy LEE,
Benton County Sheriff, and David Clark

01-403 74 S.W.3d 634

Supreme Court of Arkansas
Opinion delivered May 16, 2002

712

*Ranae Bartlett* and *Todd P. Guthrie*; *Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A.*, by: *David Matthews* and *George R. Rhoads*, for appellant.

*Odom & Elliott*, by: *Bobby Lee Odom* and *Conrad T. Odom*, for appellee.

A NNABELLE CLINTON IMBER, Justice. Appellant Wal-Mart Stores, Inc., appeals from a judgment entered on September 6, 2000, in favor of Appellee David Clark and from the denial of its posttrial motions. A jury found in favor of David Clark on the issues of defamation, false-light invasion of privacy, and intrusion invasion of privacy. The judgment awarded by the jury totaled $651,000 in compensatory damages and $1,000,000 in punitive damages, plus costs and interest. We affirm.

In 1998, employees in the Wal-Mart Maintenance Department informed their supervisors that fellow employees Gene Addington, Bob Kitterman, and David Clark were taking home tools and equipment from Wal-Mart without proper authorization. Wal-Mart Loss Prevention Officer Jim Elder was assigned to investigate potential theft. He interviewed the informants, who reiterated that they had observed David Clark taking Wal-Mart property and placing the items into his vehicle. Elder then conducted surveillance on Bob Kitterman, which revealed Kitterman removing tools from Wal-Mart and giving them to his son-in-law. Consensual searches of both Kitterman's and his son-in-law's residences resulted in the discovery of Wal-Mart property. According to Elder, Kitterman stated that he had given some stolen Wal-Mart merchandise to David Clark. Wal-Mart never conducted surveillance on Clark.

David Clark was employed by Wal-Mart from July 31, 1989, until he was officially terminated on August 24, 1998. On August

17, 1998, Elder interviewed David Clark in the Quail Room at Wal-Mart's Home Office in connection with Elder's theft investigation. What Elder and Clark discussed in that room was the subject of sharply conflicting testimony at trial. Clark testified that Elder told him Wal-Mart was investigating some missing life jackets and fishing poles and wanted to know if Clark had taken them. Clark stated that he consented to a search of his residence only to show Elder that he did not have any fishing equipment. Elder, on the other hand, admits to mentioning stolen fishing equipment in his conversation with Clark, but claims he did not indicate that was the thrust of his investigation. He testified that he also mentioned computers and tools. Wal-Mart contends that Clark gave an unlimited consent to search. Some handwritten notes made by Clark within a day after the incident recount:

> We were alone. Jim said I suppose you heard what happened to Mr. Kitterman. I replied No!! . . . Mr. Elder then said that Mr. Kitterman had been suspended after they had searched his shop. Now you need to be able to look Mr. Soderquist in the eye and say you didn't steal anything. We need to go to your house and look in your barn. I said OK! We left the Quail Room and started outside. . . . Mr. Elder then ask [*sic*] about some fishing equipment and life vests, and why I would let Kitterman drop them off at my house. I told him I had no idea and I didn't know anything about any life vests or fishing equipment.

At trial, counsel for Wal-Mart used Clark's notes to suggest that the fishing equipment and life vests were not mentioned inside the Quail Room where Clark gave Elder verbal consent to search.

After the Quail Room interview, Elder called Detective James Haskins of the Rogers Police Department and asked the detective to meet them at Clark's residence. Elder stated that, though Wal-Mart does it's own internal investigation, he always calls the police for safety reasons, as well as for the legality of the search and for evidence purposes. Detective Haskins stated at trial that Elder advised him "that Clark had given them permission to go over to his residence located in Rogers and . . . recover some property that belonged to Wal-Mart." Detective Haskins testified that he believed Elder was referring to stolen property. The police report stated that on August 17 "Elder advised [Haskins]

that he was en route to 402 East Spruce Street in order to conduct a consent search of this residence looking for stolen property." Detective Haskins arrived at the scene with Detective Scott Briggs, and the detectives presented Clark with a written consent-to-search form, which he signed. The detectives did not give Clark either verbal or written *Miranda* warnings. Clark's handwritten notes indicate that, prior to signing the form, Elder told him "Kitterman will be in jail tomorrow." The notes further describe Clark's recollection of the events that day:

> [T]he man with Rogers P.D. came over to me and said that he was there to protect Wal-Mart and he had a consent to search form allowing Wal-Mart to search my property. . . . After I had signed the form, Mr. Elder came over to where we were standing and ask [*sic*] if he was going to need a big truck like they had to have at Kittermans. I said I don't think so!! We then walked over to my shop building and I opened the door. Mr. Elder walked in and [Mr. Womack] said . . . I'm going to turn you in to the IRS. . . . I then went into the house . . . and gathered a handful of receipts from the Associate Store and went back outside to Mr. Elder. I held out the receipts to him and ask [*sic*] him to please look at them as all of the items in my shop belonged to me and that I used to repair equipment for Clarence Leis at the Associate Store for re-sale to our associates. Mr. Elder [*sic*] that doesn't matter Clarence Leis has got [*sic*] a lot of people in trouble. At this point . . . I became very devastated by the whole thing. I told Mr. Elder that I can prove what belongs to me. He then said we will load it all and you can prove what belongs to you later.

Detective Briggs testified that he called dispatch and asked for the assistance of more officers. The evidence shows that a total of five police detectives and one police officer were eventually involved in the search. The police assisted Elder and Kenneth Womack, another Wal-Mart Loss Prevention Officer, in a search of Clark's home and a shop building on his property. Elder and Womack also enlisted the help of approximately ten to fifteen additional Wal-Mart employees.

The search lasted approximately seven hours, during which time Wal-Mart seized over 400 items, including computer parts, printers, VCRs, TVs, camcorders, fax machines, typewriters, and

telephones, among other things. At the outset of the search, Clark told Elder that he repaired items for Wal-Mart and that Clarence Leis had given him some salvage merchandise to keep. As the items were being removed from Clark's home and shop, they were placed out in his yard so that they could be inventoried, photographed, and logged. Detective Haskins indicated that it was probably his decision to put the merchandise in the yard. However, Donna Jackson from Wal-Mart's Corporate Fraud Division testified that both Elder and Womack were instrumental in instructing other employees which property was to be taken out onto the lawn. After the items had been inventoried, Wal-Mart placed them into a U-Haul truck.

While most of the property was on Clark's lawn, local media arrived to cover the story. The next morning, *The Morning News* featured the merchandise seizure on its front page with the headline "Police seize stolen electronic equipment believed to have come from Wal-Mart." The story was accompanied by a photograph of the property laid out in Clark's yard. The caption under the photograph read: "Rogers police and Wal-Mart employees examine about $50,000 worth of items collected from a Spruce Street residence Monday as part of a continuing theft investigation." The article listed Clark's street address, and Clark's wife was one of several people identifiable in the photograph. The article quoted Detective Haskins as a source of some of its information. On August 19, 1998, the *Benton County Daily Record* published a similar article.

In his written notes, Clark stated that the contents of his home and shop which were seized by Wal-Mart amounted to an accumulation of over twenty years of business and hobby. In addition to his work at Wal-Mart, Clark had maintained a workshop in his home since the 1970's where he operated an electronics repair business known as Clark's Repair Service. Clark also performed electronics repair work for many different departments of Wal-Mart, including the Wal-Mart Associates' Store. Clark was a frequent customer of the Associates' Store, a store where damaged or salvage merchandise from the retail stores is sent for sale to Wal-Mart employees at discounted prices. During much of the time in question, Clarence Leis was the manager of the Associates' Store.

Leis often asked Clark to repair items for the store, and there was evidence that he informed Clark that he could keep some items that he could not repair. Clark did many of the repairs at home on his own time without charging Wal-Mart for anything other than the cost of parts. Elder stated that, during the course of his investigation of Clark, he interviewed a new manager of the Associates' Store. However, Elder admitted that he did not make any attempt to interview Leis before searching Clark's residence because Leis had not been with Wal-Mart for two years. Elder acknowledged that, on the day the property was seized from Clark's residence, Clark informed him that he was repairing items for Wal-Mart.

On August 25, 1998, loss-prevention officers Elder and Womack presented a case synopsis detailing the investigation to Wal-Mart supervisory personnel, the police, and the prosecutor's office. Melinda Hass, a Wal-Mart personnel manager, testified that David Clark was officially terminated from his employment with Wal-Mart, and that the decision to terminate him was based on Elder's report. According to both Melinda Hass and David Passmore, Wal-Mart's Director of Store Planning, Clark was officially terminated "[f]or violation of a company policy, not having a material pass or a proper permission from a supervisor to have Wal-Mart equipment."

Five months after the incident, the Benton County Prosecuting Attorney refused to formally file criminal charges against Clark. Wal-Mart filed an action in replevin to recover the property seized at Clark's residence, which was being held at the Benton County Sheriff's Office. Clark counterclaimed asserting violations of federal and state civil rights laws and six other causes of action: the tort of outrage, negligent supervision, deceit, defamation, false-light invasion of privacy, and intrusion invasion of privacy. The jury trial in this matter lasted for eleven days. Wal-Mart was granted a directed verdict as to thirty-seven items appearing on a property list compiled by Wal-Mart and purporting to contain the items taken from Clark's residence.[1] Those

---

[1] The property taken from Clark's residence was inventoried by the police on the day of the search. The police made a handwritten inventory which was later typewritten.

thirty-seven items did not appear in the police inventory of items seized from Clark, and Clark claimed that none of those items came from his residence. Wal-Mart dismissed its replevin action as to' every item that Clark identified as being seized from his home. Those items included goods that Clark had purchased from Wal-Mart, the Associates' Store, and Wal-Mart's Used Asset Division; items he was repairing for other customers; and a "half a dozen" items given to him by Clarence Leis.

At Wal-Mart's request, the trial on Clark's counterclaims was trifurcated into separate phases on liability, compensatory damages, and punitive damages. Clark voluntarily dismissed his claim for negligent supervision, and Wal-Mart's motion for directed verdict was granted with respect to Clark's claims for civil rights violations, outrage, and deceit. The jury, in answers to interrogatories, returned a verdict in Clark's favor on defamation, false-light invasion of privacy, and intrusion invasion of privacy. Wal-Mart filed posttrial motions for judgment notwithstanding the verdict, new trial, and remittitur, which were denied after a hearing. Wal-Mart then filed this appeal.

Wal-Mart asserts four main points on appeal: (1) the trial court erred in submitting the intrusion invasion-of-privacy claim to the jury because Clark consented to the intrusion, and a finding of liability would violate due process; (2) the trial court erred in denying Wal-Mart's motion for judgment notwithstanding the verdict on republication defamation because there was no evidence that Wal-Mart made defamatory statements to the newspapers and because Clark failed to submit a jury instruction on republication; (3) the trial court erred in submitting the defamation claim to the jury because Clark failed to present substantial evidence to defeat Wal-Mart's qualified privilege and to show that his damages were proximately caused by the case synopsis; and (4) the trial court erred in submitting the false-light invasion-of-pri-

---

After the police inventory was complete, the property was loaded into a U-Haul truck and taken to a Wal-Mart facility where it was placed in a trailer with various items of property recovered from the homes of other Wal-Mart employees. Later, the property was removed from that trailer and placed into a separate trailer containing only the property presumed to have come from Clark's residence. At that point, Wal-Mart made its own inventory list of the property.

vacy claim to the jury because Clark failed to demonstrate by clear and convincing evidence either the elements of false light or that Wal-Mart was not entitled to a qualified privilege. We consider each argument in turn.

## I. Standard of Review

 Our standard of review of the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481 (2000). Similarly, in reviewing the denial of a motion for judgment notwithstanding the verdict, we will reverse only if there is no substantial evidence to support the jury's verdict and the moving party is entitled to judgment as a matter of law. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000); *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 (1991). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481. It is not the appellate court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Id.* In reviewing the sufficiency of the evidence as being substantial on appellate review, we need only consider the testimony of the appellee and the evidence that is most favorable to the appellee. *Wal-Mart Stores, Inc. v. Dolph*, 308 Ark. 439, 825 S.W.2d 810 (1992). Circumstantial evidence may meet the substantial-evidence test. *Id.*

## II. Intrusion Invasion-of-Privacy Claim

 Wal-Mart contends that Clark failed to establish the essential elements of the tort of intrusion. In *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979), this court adopted the approach of the *Restatement (Second) of Torts*, which delineates four separate torts grouped under "invasion of privacy." The privacy tort covers behavior harmful to the plaintiff even though there is no injury to his reputation. *Dunlap v. McCarty*, 284 Ark. 5, 678 S.W.2d 361 (1984). Intrusion has been recognized in Arkansas as one of the four actionable forms of invasion of privacy. *Milam v. Bank of Cabot*, 327 Ark. 256, 937 S.W.2d

653 (1997). Intrusion is the invasion by one defendant upon the plaintiff's solitude or seclusion. *Id.*

 Although Arkansas courts have seldom adjudicated intrusion claims, the United States Court of Appeals for the Eighth Circuit opined that, because this court adopted the Restatement approach, Arkansas courts would likely follow the Restatement's analysis of the tort of intrusion. *Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871 (8th Cir. 2000). The Restatement defines liability for intrusion upon seclusion as follows:

> One who intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Id.* at 875 (quoting *Restatement (Second) of Torts* § 652B (1977)). According to the Eighth Circuit, the tort consists of three parts: (1) an intrusion; (2) that is highly offensive; (3) into some matter in which a person has a legitimate expectation of privacy. *Id.* A legitimate expectation of privacy is the "touchstone" of the tort of intrusion. *Id.* at 877.

The instruction submitted to the jury on intrusion in this case was as follows:

> David Clark claims damages from Wal-Mart for intrusion invasion of privacy and has the burden of proving each of six essential propositions:
> First, that he sustained damages;
> Second, *that Wal-Mart intruded physically or otherwise, without permission, invitation, or valid consent upon the solitude of David Clark;*
> Third, that the interference with the seclusion of David Clark was a substantial one;
> Fourth, that the interference with David Clark's seclusion was of a kind that would be highly offensive to the ordinary person;
> Fifth, that the interference with David Clark's seclusion was a result of conduct to which a reasonable person would object;
> Six, that David Clark's damages were proximately caused by Wal-Mart's intrusion.

> *A person validly consents to an intrusion if, in the totality of the circumstances, the consent is given freely and without coercion.*

(Emphasis added.) The jury instruction was submitted without objection, and nine members of the twelve-person jury ultimately found that David Clark had proven by a preponderance of the evidence the six essential propositions showing that Wal-Mart invaded his privacy by intruding upon his solitude. Wal-Mart contends that Clark did not establish either a substantial intrusion or a legitimate expectation of privacy.

## A. Substantial Intrusion

Wal-Mart first argues that there could be no substantial intrusion because Clark consented to the search by Wal-Mart. An intrusion occurs when an actor "believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act." *Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d at 876 (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1083 (3d Cir. 1989) (applying § 652B of the Restatement per Pennsylvania law)). Wal-Mart asserts that its employees could not have intruded upon Clark's solitude because Clark consented to the search, thus giving Wal-Mart employees the necessary legal or personal permission to commit the intrusive act. Wal-Mart points to three instances of consent by Clark: Clark's verbal consent in the Quail Room; Clark's written consent at the scene; and Clark's tacit consent during the search.

Both Wal-Mart and Clark agree that Clark verbally consented to a search of his property during his discussion with Elder on the morning of August 17, 1998. However, they disagree as to the scope of that consent. The scope of Clark's consent was a question of fact for the jury. At trial, Clark testified that, when he met Elder in the Quail Room on August 17, Elder told him that Wal-Mart was investigating some missing life jackets and fishing poles. Elder also told Clark that Bob Kitterman had admitted to leaving such stolen items at Clark's house. Clark denied having any such equipment at his home, but Elder said he would need to go to Clark's residence to look for the items. Clark felt that Wal-Mart was accusing him of stealing and agreed to let Elder search

for the property. Clark contends that Elder tricked him into agreeing to the search by telling him that Wal-Mart was only looking for some missing life jackets and fishing poles. He maintains that any consent he gave was limited to a search for fishing equipment. Clark testified that Elder did not mention searching for electronic equipment in the Quail Room or at any time before Clark let Wal-Mart employees and police into his shop. He stated that Elder left him with the impression that he would be fired if he did not consent. Elder's version of the incident is that he informed Clark that Wal-Mart was going to conduct a broad search of his residence for fishing vests, skiing equipment, computers, and tools. Elder maintains that, during the meeting in the Quail Room, Clark admitted to having property at his home that belonged to Wal-Mart.

At trial, Clark testified that he was certain Elder mentioned fishing equipment in the Quail Room. Wal-Mart counters with handwritten notes made by Clark within one day after the events of August 17, 1998, in which Clark seems to indicate that he agreed to let Wal-Mart search his property before any mention of fishing equipment. At trial, Clark acknowledged that his written statement did not indicate any reference to fishing equipment by Elder until after the two had left the Quail Room. However, during cross-examination by Wal-Mart's counsel, Clark clarified that he did not remember the events occurring as they were set out in his written statement:

> COUNSEL: . . . the business about the fishing equipment and the life jackets, that didn't get talked about in the Quail Room either, did it?
>
> CLARK: I guess it was right outside the Quail Room.
>
> COUNSEL: Yeah, after you had already told him he could come and search your barn. All this business we've been through for two weeks about how you got taken there because you thought all he wanted to look for was fishing equipment and life vests is just flat wrong, isn't it, Mr. Clark?
>
> CLARK: No. I still was under the impression it was fishing equipment and life jackets he was wanting to look for.

COUNSEL: Why? You write in your statement that he tells you about Kitterman, that he tells you that he needs to go to your house and look and that you said okay and there's not word one mentioned about fishing equipment or life jackets till you're on the way out to the car.

CLARK: I don't remember it that way.

There is a second instance in Clark's testimony that Wal-Mart claims is an indication Clark later adopted the written version of his statement:

COUNSEL: Okay. Now, I want — you just think she's mistaken about that?

CLARK: Yes, sir.

COUNSEL: Is it possible you are mistaken, Mr. Clark, that you are just as mistaken about that as you were that strongly-held belief that the talk about life jackets and fishing equipment happened in the Quail Room?

CLARK: No, I'm not mistaken about that.

COUNSEL: Can't you be the one mistaken? You're not?

CLARK: No.

COUNSEL: See, you remember I asked you this morning if you were just — if you were certain about the fishing equipment and life jackets in the Quail Room, if that was as true as all the rest of your testimony and you said it was.

CLARK: Yes, sir.

COUNSEL: But now we know that that wasn't true, don't we?

CLARK: I was mistaken.

Though Wal-Mart utilizes this portion of the testimony to buttress its assertion that Clark adopted his written statement, the vagueness of the colloquy demonstrates that the proposition is not as conclusive as Wal-Mart contends. Clark repeatedly stated to the jury that, at the time he gave consent to search, he was "still [ ] under the impression it was fishing equipment and life jackets [Elder] was wanting to look for."

 Even if Elder's statement about fishing equipment occurred outside the Quail Room, it was nonetheless evidence of notice to Clark prior to arrival at his residence that Elder intended to limit the scope of his search. Clark was entitled to rely on Elder's stated limitation in choosing not to revoke his verbal consent prior to the search, and the jury could have believed that he so relied. This court has often said that credibility is always a question of fact for the jury to decide. *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997). In this case, the jury heard the conflicting stories of Clark and Elder regarding the scope of Clark's verbal consent. As reflected by its verdict, the jury accepted Clark's trial testimony as more credible and concluded that his verbal consent was limited in scope.

 In support of its contention that Clark consented to the search, Wal-Mart also relies on a written consent-to-search form signed by Clark. In this case, the court instructed the jury that a person validly consents to an intrusion if, in the totality of the circumstances, the consent is given freely and without coercion. Though the validity of Clark's consent in this civil case does not involve a defendant's motion to suppress evidence seized in a criminal case, the standard for determining valid consent in the criminal context is helpful. As stated in the jury instruction, consent must be given freely and voluntarily to be valid. *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002). It must be shown that there was no duress or coercion, actual or implied. *Id*. The voluntariness of consent must be judged in light of the totality of the circumstances. *Id*. In a civil case, the issue of whether consent was valid is a question of fact that must be decided by the trier of fact. Thus, we look to the evidence presented to the jury that could have been construed as affecting the validity of Clark's written consent.

The evidence shows that, at Wal-Mart's request, Detective Haskins and Detective Briggs arrived at Clark's residence at about the same time that Clark, Elder and Womack arrived. Detective Haskins testified that he relied on information from Elder indicating that Clark had stolen Wal-Mart property at his residence. Before the search began, Clark went inside his home to explain the circumstances to his wife who was recovering from surgery.

Clark then went back outside where he witnessed Elder copying down the license-plate numbers of all the cars on his property. At that point, Detective Haskins presented Clark with a written consent-to-search form. According to Clark, the detective told him that the form gave the police *and* Wal-Mart employees consent to search his property. Detective Haskins stated that Clark appeared to understand the written form and asked no questions. However, Clark indicated that he had never been asked to sign a consent-to-search form before, and he stated that Detective Haskins did not inform him of his right to withhold consent. Clark was consistent in his testimony that, at the time he signed the form, no one had mentioned searching for electronics or computers. Though the consent form was broadly worded, Clark still thought the search was limited to life jackets and fishing equipment, and he knew that he did not have "a truckload of . . . life jackets or fishing equipment."

Clark told the jury that he felt threatened at the time he signed the consent-to-search form. He felt like Wal-Mart was trying to "railroad" him. Clark testified that, just prior to signing the form, Elder informed him that Kitterman would soon be arrested. Elder left Clark with the impression that he would be fired if he did not consent to the search. Additionally, due to the police presence, Clark feared that he would be arrested.

Detective Haskins testified that the police are often called to participate in what is termed a "civil stand-by." In such instances, the police go with one party to "keep the peace" while that party recovers property from another party. Detective Haskins told the jury that, if there is any question as to the ownership of the property, the police do not remove it. Detective Haskins acknowledged that, while Mr. and Mrs. Clark only showed him one receipt, they both informed him that they had receipts for all the property Wal-Mart was removing. However, the police assisted Wal-Mart in removing property from Clark's residence because Elder informed Detective Haskins that the property belonged to Wal-Mart. The detective later admitted to the jury that the situation at Clark's residence was not a "civil stand-by."

Clark testified that he was not aware that he could call off the search at any time. He stated that it never occurred to him to ask Wal-Mart and the police to get off his property because, once he signed the consent form, he was under the impression that they could do whatever they pleased. The jury determined that Clark's written consent was not given freely and without coercion and, thus, was not valid consent. Considering the totality of the circumstances now before us, we conclude that there is substantial evidence to support the jury's decision.

Finally, Wal-Mart argues that, assuming there had been confusion about the extent of the search contemplated by Wal-Mart, it would have become clear to Clark during the search that Wal-Mart was looking for more than fishing equipment. Wal-Mart alleges that Clark did not object to the scope of the search, and contends that such refusal to object amounted to tacit consent. Wal-Mart focuses on the facts that Clark unlocked the doors to his shop to let investigators in, that Clark stated "take it if you want it" with regard to some property, and that Clark's wife told them not to forget the property in the attic. Wal-Mart cites this court to *Alexander v. Pathfinder, Inc.*, 189 F.3d 735 (8th Cir. 1999), in which the Eighth Circuit, applying Arkansas law, found that a woman failed to state a claim for intrusion based on Pathfinder's tape-recording of conversations between her and her son. The decision was based upon evidence that the woman saw Pathfinder's employees with tape-recorders and failed to protest. *Id.*

In the case now before us, however, there is evidence that Clark objected to the search by Wal-Mart. Initially, according to Clark, the investigators explained to him that they were going to take what they wanted and he could prove what was his later. Clark testified that he attempted to show receipts and sign out sheets from the Associates' Store, but that no one was interested in looking at receipts. The police report indicated that both Clark and his wife informed officers that they had receipts for all of the property. Clark also told officers that he repaired items for Wal-Mart in his shop. Both Elder and Detective Haskins admitted to knowing that Clark repaired merchandise for Wal-Mart. According to Clark, however, no one asked him to help identify any of the property. He testified that he objected to Wal-Mart taking

certain items and admitted that he was stronger on his explanation of some items than others. Some of the specific items that Clark protested were left behind, and some were taken by Wal-Mart.

As to his state of mind at the time, Clark testified: "I was pretty rattled"; "I felt like they were trying to railroad me"; "I said 'take it if you want it' because I was pretty well defeated"; "I had given up"; "I was heartsick." Clark stated that, at one point during the search, Womack started beating his hands and said he was going to report Clark to the IRS. Others present at the search, including Elder, Detective Haskins, and Ted Brauburger, corroborated Clark's testimony that he was very distraught and upset, "defeated," "real sad," and "crushed." Thus, we hold there is substantial evidence upon which the jury could have based its conclusion that Clark did not tacitly consent to the search by Wal-Mart.

### B. Legitimate Expectation of Privacy

Wal-Mart's next contention is that it did not intrude upon any legitimate expectation of privacy where Clark consented to the search. The plaintiff in an invasion-of-privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy. *Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d at 877 (quoting *Hill v. National Collegiate Athletic Ass'n*, 7 Cal.4th 1, 865 P.2d 633, 26 Cal. Rptr. 2d 834 (1994)). Wal-Mart asserts that there is no legitimate expectation of privacy in one's home where that person signed a consent form allowing a search. Clark counters that his consent to search was limited, as well as obtained through fraud and misrepresentation. As previously discussed, substantial evidence supports the jury's verdict in favor of Clark on the validity of his consent to Wal-Mart's intrusion. The jury could have reasonably concluded from the record that any consent Clark may have given was both limited and obtained through duress or coercion and, therefore, invalid. As Wal-Mart's argument is premised on the assumption that Clark validly consented to a search of his residence, the argument must fail.

## C. Deprivation of Due Process

Finally, Wal-Mart asserts that affording Clark recovery on the intrusion cause of action would operate to deprive Wal-Mart of its constitutional right to due process. Clark replies that Wal-Mart's due process argument is not preserved because it was not raised in Wal-Mart's motions for directed verdict. Wal-Mart argues that the due process argument is preserved because the argument was included in its motion for judgment notwithstanding the verdict, new trial, and remittitur. In *Willson Safety Products v. Eschenbrenner*, 302 Ark. 228, 788 S.W.2d 729 (1990), this court said "the motion for judgment N.O.V. is permitted by the rule for the express purpose of not only again raising the question of sufficiency of the evidence but also all other questions of law *properly preserved during trial. . . ." Id.* at 232, 788 S.W.2d at 732 (emphasis added). This language discounts Wal-Mart's argument for preservation, as Wal-Mart did not raise its due process challenge during trial. In addition, Rule 50 of the Arkansas Rules of Civil Procedure states that a party who has moved for directed verdict may, not later than ten days after entry of judgment, move to have the verdict set aside and to have judgment entered *in accordance with his motion for directed verdict.* Ark. R. Civ. P. 50(b)(2) (2001) (emphasis added). The language of this rule indicates that a motion for judgment notwithstanding the verdict can be made only upon grounds that were raised during the trial.

In its reply brief, Wal-Mart asserts that a due process challenge is precisely the type of argument that can only be raised in a motion for judgment notwithstanding the verdict. The argument is that the imposition of a civil penalty on a party, without notice, is a due process violation that occurs only when the jury decides to award punitive damages. Wal-Mart's argument is without merit. The trial in this case was trifurcated into separate phases on liability, compensatory damages, and punitive damages at Wal-Mart's request. Thus, Wal-Mart was on notice during the trial that a civil penalty might be imposed against it and had ample opportunity to raise the issue. This court has long held that an issue, to be considered on appeal, must be properly preserved at trial. *Willson Safety Products v. Eschenbrenner*, 302 Ark. 228, 788 S.W.2d 729. As Wal-Mart did not raise its due process argument

during trial, we hold that Wal-Mart's due process challenge is not preserved for appeal.

### III. Republication Defamation Claim

On appeal, Wal-Mart claims that Clark's action for defamation was premised on republication of defamatory information in the newspaper articles. Wal-Mart then asserts that Clark should have proffered a jury instruction on republication because the basis of Clark's claim for damages was the republication of allegedly defamatory facts in the newspaper articles. Wal-Mart contends that Clark cannot now establish a republication claim because there is no evidence that Wal-Mart provided any information to the media in this case. Clark, on the other hand, asserts that Wal-Mart should have proffered an instruction on republication in its attempt to limit his right to recover on defamation because of the republication.

Courts are divided as to whether one accused of defamation is liable for the republication of another where it is shown that the republication was foreseeable as a natural and probable consequence of the original publication. *Luster v. Retail Credit* Co., 575 F.2d 609 (8th Cir. 1978). *See* M.C. Dransfield, Annotation, *Liability of Publisher of Defamatory Statement for its Repetition or Republication By Others*, 96 A.L.R.2d 373 (1964). In *Dun & Bradstreet, Inc. v. Robinson*, 233 Ark. 168, 345 S.W.2d 34 (1961), *overruled on other grounds by United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998), this court specifically refused to decide whether the law of Arkansas permitted recovery for unauthorized republication. In that case, the trial court instructed the jury not to consider any unauthorized republication in determining special compensatory damages. *Dun & Bradstreet, Inc. v. Robinson*, 233 Ark. 168, 345 S.W.2d 34. On appeal, we commented: "We see no need to discuss the issue of republication, i.e., when one may be liable for unauthorized republication of defamatory statements, since the instruction was favorable to the appellants, and appellee has made no complaint. . . ." *Id.* at 178, 345 S.W.2d at 40. The United States Court of Appeals for the Eighth Circuit, in *Luster v. Retail Credit Co.*, 575 F.2d 609, upheld a federal district court's ruling that this court, if directly confronted with the issue, would

hold that a defendant could be liable for unauthorized republications if such republications were reasonably foreseeable. Once again, that issue is not properly before us.

In the instant case, Wal-Mart was charged with defamation, and the jury was not instructed on republication. On appeal, Wal-Mart claims that it should not have been found liable for damages caused by any republication of defamatory information by the newspapers. However, Wal-Mart did not make the proper objections at trial to preserve this argument on appeal. In *Luster v. Retail Credit Co.*, regarding the defendant's liability for republications of a report it compiled, the Eighth Circuit noted:

> [D]efendant objected to the admission of testimony concerning unauthorized republications; to the admission of testimony by plaintiff concerning damages which were the result of unauthorized republications; and the giving of a jury instruction which allowed the jury to find defendant liable for unauthorized republications if they found that such republications were reasonably foreseeable, while refusing defendant's requested jury instruction which stated that defendant could not be liable for unauthorized republications.

575 F.2d at 613. Here, Wal-Mart did not object to the admission of the newspaper articles in question or to the admission of testimony from witnesses concerning damages that were the result of the newspaper articles. In addition, Wal-Mart did not proffer a jury instruction that stated Wal-Mart could not be liable for the unauthorized republications by the newspapers. Any assertion by Wal-Mart that republication was a potential issue in this case made it incumbent upon Wal-Mart to proffer a jury instruction in support of its position. The failure to proffer or abstract a proposed instruction precludes this court from considering the argument on appeal. *United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998). Thus, we hold that any argument by Wal-Mart disputing liability for the newspapers' republication is not preserved for appeal.

*IV. Defamation Claim*

Wal-Mart contends there is no evidence that any Wal-Mart employee published defamatory information about Clark, pointing out that no Wal-Mart employee was quoted in either *The Morning News* or the *Benton County Daily Record*. Wal-Mart argues that there is evidence to support the conclusion that the newspapers obtained their information from police communications rather than from Wal-Mart employees. Clark, on the other hand, argues there is substantial evidence, both direct and circumstantial, that Wal-Mart published defamatory information about him.

The jury instruction on defamation read, in part, as follows:

> David Clark claims damages from Wal-Mart for defamation and has the burden of proving each of five essential propositions defining defamation.
> First, that he has sustained damages.
> Second, that Wal-Mart published a false statement of fact concerning David Clark.
> Third, that the statement of fact was defamatory.
> Fourth, that Wal-Mart acted with negligence in failing to determine the truth of the statement prior to its publication or with knowledge that the statement was false.
> And fifth, that the publication of the statement was a proximate cause of David Clark's damages.

The trial court further instructed the jury that a defamatory statement must be false and must actually cause harm to a person's reputation. The court informed the jury that "published" refers to the act of intentionally communicating a statement to someone other than David Clark or under circumstances in which it was foreseeable that a statement would be received by someone other than David Clark.

The evidence presented at trial reflects five separate publications upon which the jury could have found Wal-Mart liable for defamation. Clark asserts that Elder first published defamatory information about him when Elder untruthfully communicated to Detective Haskins that Clark admitted having property at his residence that belonged to Wal-Mart. The case synopsis prepared by Elder and Womack details Elder's view of the events that took

place on August 17, and, therefore, would be circumstantial evidence of what Elder told Detective Haskins on the telephone when he requested that Detective Haskins meet him at Clark's residence. The entry in Elder's case synopsis for August 17 reads, in relevant part, as follows:

> On this date associate David Clark was interviewed based on information obtained through a confidential Wal-Mart associate as well as information gathered through the confiscation of Wal-Mart merchandise at the residences of Bob Kitterman and Wesley Beights. During the course of the interview Clark admitted that he had received stolen Wal-Mart merchandise from Bob Kitterman and that such merchandise had been delivered to his home at 402 E. Spruce St. in Rogers, Arkansas. Clark also admitted taking Wal-Mart merchandise to his home under the guise of mechanical repair without either doing the repair nor [*sic*] returning the merchandise. Clark also admitted having his own personal computer and electronics repair business established in his home.

The statements in the report demonstrate Elder's version of the story that Clark admitted to receiving stolen Wal-Mart merchandise and admitted to taking Wal-Mart property to his home without repairing the merchandise or returning it to Wal-Mart. This circumstantial evidence of what Elder told Detective Haskins is corroborated by Detective Haskins's testimony that he believed Elder was referring to stolen property. At trial, Detective Haskins stated that he had nothing other than statements from Elder and Wal-Mart that Clark had stolen property from Wal-Mart. Moreover, as a result of Elder's statements to Detective Haskins, the police were dispatched to Clark's residence with the purpose of confiscating stolen property.

The publications concerning Clark that were disseminated over police radio form a second group of publications upon which the jury could have found Wal-Mart liable for the tort of defamation. According to Clark, Elder knew or should have known that his untruthful statements would be disseminated on police radio, where they would be picked up by the press and the public. In fact, Elder stated in his deposition: "I think if the police department does anything, that that's kind of public information for

people to gather." In addition, testimony from a reporter for *The Morning News* confirmed that police radio communications are regularly monitored on a scanner in the newsroom. Gail Mann, Clark's neighbor, testified that she owned a police scanner and that, on August 17, she heard a communication on her scanner dispatching a car to Clark's residence for "confiscation of stolen Wal-Mart property." Further, Detective Haskins testified that the press may be alerted when five detectives are dispatched to one residence as in the instant case.

 Clark also points to circumstantial evidence to show that Wal-Mart published defamatory information to the media. Circumstantial evidence that a defamatory statement was overheard can be sufficient evidence of publication to support a verdict in favor of a defamation claim. *Wal-Mart Stores, Inc. v. Dolph*, 308 Ark. 439, 825 S.W.2d 810 (1992). In the *Dolph* case, Carolyn Dolph was accused of shoplifting in the presence of customers entering and leaving a Wal-Mart store. Although there was no testimony from individuals who actually heard the accusations, this court held that the attendant circumstances provided sufficient evidence that defamatory statements were made in the presence and hearing of other people. *Id.*

Likewise, in this case, there is circumstantial evidence that Wal-Mart employees made defamatory publications to third parties. The third and fourth instances upon which the jury could have based a finding of defamation involve Kenneth Womack. When asked if he had spoken with any member of the media on August 17, Womack responded: "Not that I am aware of. I hope I didn't. . . . It's a possibility that I could have." Later, on redirect examination, Womack clarified that he might have commented to someone he did not know about a piece of electronic merchandise, "about what type of computer is this or something like that," but not about the details of the investigation. Furthermore, Clark testified that, while on his property, he heard Womack mention a theft ring. Evidence was presented at trial showing that some neighbors were standing near Clark's residence and watching the search. As was the case in *Dolph*, due to attendant circumstances, the jury could have believed that defamatory statements were

made by Wal-Mart in the presence and hearing of either neigh-bors or media personnel who were present at the scene.

The fifth instance of defamation is the information contained in the two newspaper articles.[2] The newspaper article published on August 18 reported that the estimated value of the property seized from Clark's residence exceeded $50,000. That figure coincided with Wal-Mart's estimate as published in a case synopsis dated August 25, 1998.[3] According to the synopsis, the value assessment was made by police agencies and Wal-Mart Loss Prevention employees. The evidence shows that the items taken from Clark's residence were placed in a U-Haul truck, taken to Wal-Mart property, and transferred to a trailer containing other items allegedly stolen from Wal-Mart. This information about the property is circumstantial evidence that any estimate of the collec-tive value of the items was made on August 17 while the items were being inventoried on Clark's lawn. In his deposition testi-mony, Elder acknowledged that the estimate in the newspaper placed the value of the property at $40,000 to $50,000, and went on to comment: "Originally. That was an estimate. Like I said, we took street value." Sharon Curry, Elder's supervisor, presented conflicting testimony that she thought Wal-Mart obtained its assessment of the property's value from Stacy Walton a few days after the incident. The police inventory of the property contains no assessment of the value of any of the items seized. As previously stated by this court, it is the province of the jury to decide the credibility of witnesses. *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997). Viewing the evidence in the light most favorable to Clark, we hold that there is substantial evidence from which the jury could have concluded that Wal-Mart published false and defamatory statements about Clark by intentional com-munications or under circumstances in which it was foreseeable

---

[2] As previously discussed, Wal-Mart has not preserved for our review any challenge to liability for defamation based upon the unauthorized republications of others.

[3] Wal-Mart contends that, even if the value of property was communicated by Wal-Mart, the value is not defamatory. However, the fact that an estimate of the value of the items was made would easily lead to the conclusion that Wal-Mart assumed the property was stolen.

that the statements would be received by someone other than Clark.

Wal-Mart's next argument is that, even if the jury did find that Wal-Mart made defamatory statements about Clark that were communicated to third parties, Wal-Mart cannot be held liable for defamation because the information fell within a qualified privilege. Wal-Mart contends that Clark failed to present substantial evidence to defeat its qualified privilege. This court has clarified the conditions under which the qualified privilege may be invoked:

> A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matters which, without such privilege, would be actionable.

*Minor v. Failla*, 329 Ark. 274, 283, 946 S.W.2d 954, 958–59 (1997), *overruled on other grounds by United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998) (quoting *Navorro-Monzo v. Hughes*, 297 Ark. 444, 451, 763 S.W.2d 635, 638 (1989); *Bohlinger v. Germania Life Ins. Co.*, 100 Ark. 477, 482–83, 140 S.W. 257, 259 (1911)). We have further held that the qualified privilege must be exercised in a reasonable manner and for a proper purpose and that the immunity does not extend to irrelevant defamatory statements that have no relation to the interest entitled to protection. *Minor v. Failla*, 329 Ark. 274, 946 S.W.2d 954. The qualified privilege is lost if it is abused by excessive publication; if the statement is made with malice; or if the statement is made with a lack of grounds for belief in its truthfulness. *Id.* The question of whether a particular statement falls outside the scope of the qualified privilege for one of these reasons is a question of fact for the jury. *Id.*

Of the five instances upon which the jury could have based its conclusion that Wal-Mart was liable for defamation, the defense of qualified privilege only applies to Elder's case synopsis and the evidence of the statements made by Elder to Detective Haskins. Wal-Mart points out that the case synopsis prepared by Elder and

Womack was only provided to law enforcement officers, the prosecuting attorney, and Wal-Mart supervisory personnel. However, Clark argues that Wal-Mart exceeded the scope of any qualified privilege because Elder published statements about him with a lack of grounds for belief in their truthfulness. As previously discussed, the case synopsis is circumstantial evidence of the statements that Elder made to Detective Haskins on the morning of August 17. Clark pointed to three specific statements in the case synopsis that he contended were false. The first two statements challenged by Elder are: (1) "Clark admitted that he had received stolen Wal-Mart merchandise from Bob Kitterman and that such merchandise had been delivered to his home at 402 E. Spruce St. in Rogers, Arkansas"; and (2) "Clark also admitted taking Wal-Mart merchandise to his home under the guise of mechanical repair without either doing the repair nor [sic] returning the merchandise." The third statement in the report that Clark contended was false was a statement that, during the search, Clark identified merchandise belonging to Wal-Mart in his storage shed, house, attic, and personal vehicle.

■ According to Wal-Mart, Elder believed his statements to be true based on his impressions of his interview with Clark, the observations he made during the search of Clark's home, and the information he had from two confidential informants. Wal-Mart further asserts that when Elder made his report a week after the search of Clark's residence, he still believed that Clark had stolen Wal-Mart property. For these reasons, Wal-Mart maintains that the statements contained in the case synopsis are protected by qualified privilege. There is no cause of action for negligently reporting activity thought to be criminal in nature. *DeHart v. Wal-Mart Stores, Inc.*, 328 Ark. 579, 946 S.W.2d 647 (1997). The critical consideration is Elder's belief in the truthfulness of the statements contained in the synopsis, which statements were also circumstantial evidence of what Elder communicated to Detective Haskins. *See, e.g., Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 (1991).

■■ The three statements in the case synopsis that Clark alleges to be fabrications cannot be justified through Elder's negligence or his alleged belief in their truthfulness. This is so

because, in the first two statements, Elder states that, during the course of the interview in the Quail Room, "Clark admitted" to receiving stolen Wal-Mart merchandise and taking Wal-Mart merchandise home without authorization. Elder's personal observations during the search of Clark's house and the information he received from confidential informants have no bearing on what Clark actually admitted to Elder. According to Clark, he never made such admissions to Elder. The third statement by Elder indicates that, during the search, Clark pointed out merchandise belonging to Wal-Mart. Clark testified, however, that he did not assist in the identification of merchandise at his residence. His testimony was corroborated by Detective Haskins who verified that "Wal-Mart had a large part in determining what items were removed from Mr. Clark's" home. Again, the credibility of witnesses is an issue for the jury and not this court. *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002). Here, the jury could have concluded that Clark did not admit receiving stolen property or taking Wal-Mart property home without authorization and that Clark did not identify merchandise belonging to Wal-Mart at his residence. Under this view of the evidence, Elder would not have had any grounds to believe that his statements in the case synopsis were truthful. Statements are not protected by a qualified privilege where the author of the statements lacks a belief in their truthfulness. Viewing the evidence in the light most favorable to Clark, we hold that substantial evidence supports the jury's conclusion that Wal-Mart exceeded the scope of its qualified privilege.

For its final argument on the defamation claim, Wal-Mart contests proximate causation of damages. As for any damages flowing from the newspaper articles, Wal-Mart assumes there can be no liability for such damages because there is no evidence that Wal-Mart provided any information to the newspapers. Wal-Mart thus concludes that it can only be held liable for information published in Elder's case synopsis. Wal-Mart argues that, because there was no testimony regarding reputational damage resulting

from the case synopsis, there is insufficient evidence to support the jury's finding that Clark's damages were proximately caused by Wal-Mart. As previously discussed, Wal-Mart has not preserved any challenge to its liability for defamation based upon the republication of information by the newspapers. Thus, we consider proximate causation of damages with respect to each of five instances of defamation.

In order for liability to attach, there must be evidence that demonstrates a causal connection between defamatory statements made by Wal-Mart and the injury to Clark's reputation. *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999). A plaintiff must establish actual damage to his reputation, but the showing of harm may be slight. *Id.* A plaintiff must prove that the defamatory statements have been communicated to others and that the statements have affected those relations detrimentally. *Id.*

At trial, Clark presented testimony from two individuals who commented on reputational damage suffered by Clark as a result of the information in the newspaper articles. Hayes Buenning testified that other people he knew changed their view of Clark for the worse after the newspaper articles came out. Doug Laman indicated that the newspaper articles made it look like Clark had stolen all that merchandise and testified that the articles raised concerns about Clark and caused him to change the way he viewed Clark.

Causation is a question of fact for the jury to decide. *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576. In this case, the five instances upon which the jury could have based its finding of defamation could each have been seen by the jury as the proximate cause of Clark's reputational damages. The case synopsis is circumstantial evidence of the statements made by Elder to Detective Haskins regarding Clark. Those statements caused defamatory information about Clark to be disseminated over police radio, where such information could be heard by third parties. A reporter for *The Morning News* testified that reporters listen to police radio communications in the newsroom. Additionally, Womack testified that he may have talked to someone he did not know at Clark's residence, and Clark testified that he overheard

Womack mention a "theft ring" while on Clark's property. Either of those two statements by Womack could have been communicated to any media personnel who might have been present. There·is also circumstantial evidence that someone from Wal–Mart may have either directly or indirectly communicated to the media the value of the items seized from Clark's residence. Thus, we hold that there is substantial evidence to support the jury's finding that the damages suffered by Clark resulting from defamatory statements were proximately caused by Wal–Mart's publication of defamatory statements.

### V. False-Light Invasion-of-Privacy Claim

For its final point on appeal, Wal–Mart contends that the trial court erred in submitting the false-light invasion-of-privacy claim to the jury because Clark failed to demonstrate the elements of false light by clear and convincing evidence.[4] The trial court instructed the jury that, to prevail on his claim of false-light invasion of privacy, Clark was required to prove six essential propositions:

> First, that he has sustained damages.
>
> Second, that Wal–Mart gave publicity to a matter concerning David Clark that placed him before the public in a false light.
>
> Third, that the false light in which David Clark was placed would be highly offensive to a reasonable person.
>
> Fourth, that Wal–Mart had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which David Clark would be placed.
>
> Fifth, that Wal–Mart had serious doubts as to the truth of the matter publicized.
>
> And sixth, that David Clark's damages were proximately caused by Wal–Mart's giving of such publicity.
>
> . . . .
>
> David Clark must prove his false light invasion of privacy claim against Wal–Mart by clear and convincing evidence.

---

[4] A cause of action for both false-light invasion of privacy and for defamation can be joined in the same action; however, there can be but one recovery for any particular publication. *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979).

This court has said that, where the plaintiff is not a public figure and the publication is of matters of general or public concern, the plaintiff must prove actual malice by clear and convincing evidence. *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 .(1991) (citing *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979)). Statements made with actual malice are those made with knowledge that the statements were false or with reckless disregard of whether or not they were false. *Id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)). The constitutional definition of malice is concerned with showing the author's subjective disregard for the accuracy of his statements. *Id.*

The jury instruction given in this case conforms to our precedent in *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979), as well as the *Restatement (Second) of Torts* § 652E (1977). In *Dodrill*, this court followed the rule set forth in *Time, Inc. v. Hill*, 385 U.S. 374 (1967), where the Supreme Court held that First Amendment protection precluded recovery upon a false-light cause of action by a private individual against a publishing company in the absence of proof that the defendant published the information with knowledge of its falsity or in reckless disregard of the truth. The commentary to the Restatement notes the effect of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), a later case that restricted the requirement of showing actual malice to public officials and public figures. *Restatement (Second) of Torts* § 652E, Clause (b) to commentary (1977). Under *Gertz*, other plaintiffs are required only to show that the defendant was, at least, negligent with regard to truth or falsity. *Gertz v. Robert Welch, Inc., supra.* As noted in the Restatement commentary, the effect of the *Gertz* decision upon the Court's holding in *Time, Inc. v. Hill* has been left in a state of uncertainty. *Restatement (Second) of Torts* § 652E, Clause (b) to commentary (1977). For this reason, the American Law Institute added a caveat to section 652E leaving open the question of whether there may be liability based upon a showing of negligence as to truth or falsity. *Restatement (Second) of Torts* § 652E, Caveat (1977). However, because neither party challenged the jury instruction in the case now before us, the actual malice standard is applicable.

In regard to the false-light claim, Wal-Mart first asserts that Clark did not prove by clear and convincing evidence that Wal-Mart created publicity that placed Clark in a false light. The evidence reflects three separate episodes upon which the jury could have based liability for false light: (1) the case synopsis, (2) the newspaper articles, and (3) the publicity created on Clark's lawn. As to the case synopsis, Wal-Mart argues that there is no evidence the synopsis was ever communicated beyond the limited audience of Wal-Mart management, law enforcement, and prosecutors. Wal-Mart thus concludes that the case synopsis could not have been the basis for a false-light claim. This assumption and conclusion is not supported by the evidence when it is viewed in a light most favorable to Clark. The case synopsis was published to police, Wal-Mart supervisory personnel, and the prosecuting attorney, and the synopsis branded Clark as an "admitted thief." Thus, Wal-Mart created publicity placing Clark in a false light. In addition, the case synopsis is circumstantial evidence of what Elder told Detective Haskins, leading Detective Haskins to believe there was stolen property at Clark's residence. Elder's indication to Detective Haskins that Clark admitted to having stolen property at his residence created an additional type of publicity that placed Clark in a false light. It led Detectives Haskins and Briggs to call for additional police detectives to meet them at Clark's residence. Furthermore, this communication created publicity over the police radio indicating there was "stolen property" at Clark's residence. At least one of Clark's neighbors testified to hearing the police radio communication.

With regard to the newspaper articles, Wal-Mart again argues there is not clear and convincing evidence to support the conclusion that Wal-Mart published information to the newspapers placing Clark in a false light. As discussed earlier in connection with the defamation claim, the record reveals circumstantial evidence of at least five instances involving statements by Wal-Mart that placed Clark in the false light of being an "admitted thief."

Finally, Clark asserts that the display of items of property on his lawn during the inventory and seizure process created publicity placing him in a false light. The evidence presented at trial indicates that anywhere from ten to fifteen Wal-Mart employees were

present at Clark's residence and were removing electronic items from Clark's home and shop and placing them on his lawn to be photographed and inventoried. Five police detectives and one police officer from the Rogers Police Department were at the scene. Detective Haskins told the jury that, "it is usually a bigger scene if a detective goes out because we are only called out for major crimes or major happenings." In addition to the fifteen to twenty people occupying Clark's yard and the over 400 items of property placed on Clark's lawn, Wal-Mart rented a U-Haul truck in which to load the items. The truck was parked on Clark's lawn between his house and shop building.

The nature of the scene itself could have potentially alerted newspaper reporters, leading to the published article indicating that Clark was a thief. There is also testimony that several individuals watched as the police and Wal-Mart employees carried items out onto Clark's lawn. In particular, a UPS delivery man testified that he saw several policemen at Clark's house in addition to "the Loss Prevention truck from Wal-Mart . . . and . . . [Loss Prevention people and police] pulling stuff out of a garage and laying it out on the driveway there." This caused him to think that Clark had been arrested for drugs. Thus, we hold that the record in this case reveals evidence of a clear and convincing nature upon which the jury could have based its verdict that Wal-Mart created publicity that placed Clark in a false light.

Wal-Mart next contends there is no evidence of its knowledge or reckless disregard with respect to the falsity of the publicized matter. Wal-Mart maintains that the record affords no evidentiary basis for the conclusion that it acted with reckless disregard as to the falsity of the publicized matter. The arguments by Wal-Mart are based on Elder's testimony that he believed the statements in the case synopsis to be true and the claim that Elder had a legitimate basis for the conclusions in the synopsis. In response, Clark refutes Wal-Mart's arguments by stating that Elder must have at least entertained serious doubts about the truth of the synopsis because, according to Clark, Elder's statements about Clark's alleged admissions were outright fabrications. In addition, Clark contends that the synopsis must have been written with at least reckless disregard as to its truth due to the fact that Clark

informed Elder that he repaired merchandise and had permission to have the merchandise at his home. According to Clark, Elder should have taken steps to verify whether Clark had permission to possess the items before continuing with the seizure. Clark points to the testimony of Ted Brauburger, Clarence Leis, Brett Stine, Hayes Buenning, and others who testified it was common knowledge that Clark repaired merchandise for Wal-Mart.

 A failure to investigate alone does not establish the bad faith inherent in malice. *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97. However, once Clark informed Elder that he had permission to possess the property, the jury could have believed that Elder was reckless and acted with actual malice in refusing to inquire further before continuing the seizure. The jury could have also inferred that, based on what Elder knew, he must have had serious doubts as to the truth of the statements he communicated to Detective Haskins and included in the case synopsis. These same conclusions would also apply to the public display created around Clark's residence. The evidence, when viewed in a light most favorable to Clark, shows that the display was set in motion due to Elder's reckless disregard as to the falsity of his statements that Clark admitted to stealing items from Wal-Mart. Accordingly, we hold that the record reveals evidence of a clear and convincing nature upon which the jury could have based its verdict that Wal-Mart had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Clark would be placed.

Finally, Wal-Mart once again asserts the defense of qualified privilege. As discussed above, a communication may be held to be qualifiedly privileged when it is made in good faith and in reference to a subject-matter in which the communicator has an interest or duty and to a person having a corresponding interest or duty. *See Minor v. Failla*, 329 Ark. 274, 946 S.W.2d 954 (1997), *overruled on other grounds by United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998). The qualified privilege is lost if abused by excessive publication, where a statement is made with malice, or where a statement is made with a lack of grounds for belief in its truthfulness. *Id.* Again, the question of whether a

particular statement falls outside the scope of the qualified privilege is a question of fact for the jury. *Id.*

██ Of the publications upon which the jury could have based its finding of false light, the defense of qualified privilege applies only to Elder's publicity to Detective Haskins and the publicity to Wal-Mart supervisory personnel through the case synopsis. As previously discussed in relation to the defamation claim, Clark contests three specific statements made by Elder. Wal-Mart claims that the statements are privileged because they were only made to police, the prosecuting attorney, and Wal-Mart supervisory personnel. However, Clark asserts that the statements exceeded the scope of any qualified privilege because they are fabrications and, therefore, were published without any grounds for belief in their truthfulness. As with Wal-Mart's claim of qualified privilege in regard to the defamation claim, we hold that the jury could have concluded that Elder would not have had any grounds to believe that the statements in question were truthful. Thus, we are satisfied that the record does not lack clear and convincing evidence upon which the jury could have based its verdict that Wal-Mart was not entitled to the defense of qualified privilege.

With regard to damages on the false-light cause of action, Wal-Mart includes only a footnote in its argument on defamation suggesting that its argument on damages relating to defamation applies equally to the false-light invasion-of-privacy claim. Our earlier discussion on this point also applies to this summary argument.

██ In the damages phase of this case, the court instructed the jury that Clark was not entitled to recover damages for more than one cause of action based upon a single set of facts or events, even though more than one cause of action might be applicable to the facts or events. Accordingly, this court's affirmance of the jury's verdict in Clark's favor on at least one cause of action means that the jury's award of compensatory and punitive damages totalling $1,651,000 must stand.

Affirmed.

CORBIN, J., not participating.

THORNTON, J., dissenting.

R AY THORNTON, Justice, dissenting. In its analysis of the intrusion invasion-of-privacy claim, the majority has concluded that there was substantial evidence to support the jury's verdict that Clark established a legitimate expectation of privacy in his property because the scope of the verbal consent Clark gave to Elder was limited in scope to a search for missing life jackets and fishing poles and that his written consent was not given freely and without coercion. I cannot agree with the majority's conclusion regarding Clark's verbal and written consent. For this reason, I respectfully dissent.

As the majority acknowledges, our standard of review of the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481 (2000). We will reverse only if there is no substantial evidence to support the jury's verdict and the moving party is entitled to judgment as a matter of law. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000); *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 (1991). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or another. *George, supra.* It is not the appellate court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Id.* In reviewing the sufficiency of the evidence as being substantial on appellate review, we need only consider the testimony of the appellee and the evidence that is most favorable to the appellee. *Wal-Mart Stores, Inc. v. Dolph*, 308 Ark. 439, 825 S.W.2d 810 (1992).

In addition, the majority correctly acknowledges that intrusion has been recognized in Arkansas as one of the four actionable forms of invasion of privacy. *Milam v. Bank of Cabot*, 327 Ark. 256, 937 S.W.2d 653 (1997). The majority also notes that the Eighth Circuit has opined that while Arkansas courts have seldom adjudicated intrusion claims, we would likely follow the *Restatement (Second) of Tort*'s analysis of the tort of intrusion, whereby a plaintiff must establish that there has been (1) an intrusion; (2) that

is highly offensive; (3) into some matter in which a person has a legitimate expectation of privacy. *See Fletcher v. Price Chopper Foods of Trumann, Inc.,* 220 F.3d 871 (8th Cir. 2000) (citing *Restatement (Second) of Torts* § 652B (1977)).

In the present case, I am unable to agree that there was substantial evidence that Clark, who gave both verbal and written consent to a search of his property, had a legitimate expectation of privacy of this case. Clark testified that the verbal consent he gave Elder when Elder interviewed him in the Quail Room was limited in scope to a search of his property for missing life jackets and fishing poles. However, Clark's own handwritten notes, which were written the day after the search, indicate that his verbal consent was not limited to a search for missing life jackets and fishing poles, but, rather, was broadly given. When asked about his handwritten notes, Clark conceded that he was mistaken in his testimony and adopted the recitation of the facts regarding his verbal consent as he had written in his handwritten notes. Clark testified on recross examination:

> The discussion about the life jackets and the fishing equipment didn't happen in the Quail Room. I guess it was outside the Quail Room. I was still under the impression that it was fishing equipment and life jackets he was looking for even though the conversation happened *after I told him he could search my barn.* I don't remember it that way. *I possibly had it closer to right when I wrote the statement.* I don't know.

(Emphasis added.) Clark also testified on recross examination:

> I remember you asked me this morning if I [was] certain about the fishing equipment and life jackets in the Quail Room and I said I was. *I was mistaken about that.*

(Emphasis added.)

The majority concludes that this conflict between Clark's initial testimony and his corrected testimony after reviewing his own prior handwritten notes was an issue for the jury to decide. However, what the majority fails to recognize is that Clark repudiated his own prior statement when he adopted as true his handwritten notes, which reflected that he consented to a general search when first asked for consent. Only two people were in the

Quail Room at the time that Mr. Elder asked for permission to search and Mr. Clark gave his consent. That oral consent was reaffirmed by a written consent to a general search, and Mr. Clark certainly understood that the search was general. On unlocking his shop door, he pointed to an air compressor and said that it belonged to Wal-Mart.

With reference to the initial oral request, it is clear that Mr. Elder's testimony was an unequivocal statement that a general consent was given. However, the majority finds that there was a credibility question as to which of two statements by Mr. Clark the jury would believe: (1) his first testimony that his consent in the Quail Room was limited to a search for fishing equipment, or (2) his repudiation of that testimony after being confronted with his own contemporaneous notes. When resolving a discrepancy in the testimony of a witness, the general rule is that a credibility question is presented to the jury. *See Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997). However, this is not the rule when a witness is also a party to the action, and his testimony amounts to a judicial admission. A judicial admission is conclusive and bars the party himself from disputing it. *See* 9 John H. Wigmore, *Evidence in Trials at Common Law* § 2594a (Rev. ed. 1981). Wigmore refers to an Arkansas case on this point, *Missouri Pac. R.R. Co. v. Eubanks*, 212 Ark. 652, 207 S.W.2d 610 (1948), *rev'd on other grounds sub nom. Eubanks v. Thompson*, 334 U.S. 854 (1948), where we held that plaintiff's testimony that warning signals were given by the train was conclusive on that point, and that the testimony of other witnesses that they heard no warning signals did not raise a credibility issue for determination by the jury. *See* Wigmore, *supra* n. 1, at 834 (citing *Eubanks*, 212 Ark. 652).

In the case before us, the trial court apparently recognized this principle, but failed to go to the record to resolve the question, as is reflected in the following colloquy that occurred between the trial court and Ranae Bartlett and George Rhoads, the attorneys for Wal-Mart:

Ms. BARTLETT:

The cornerstone of the tort of intrusion is legitimate expectation of privacy. The key to Wal-Mart's defense is the consent.

We have three places where the consent occurred. Consent occurred at the Home Office at the initial interview when he said he would go ahead and show them his property. Consent occurred when they arrived at the property and the police came with a broadly written, very simply worded written consent form that he signed with no limitations. And then consent occurred throughout the process. His tacit consent, his failure to object, his failure to withdraw the consent. In light of the consent to search, there can be no tort of intrusion.

The court has expressed concern about Mr. Clark's allegation that the only reason he consented was because he thought that they were looking for fishing equipment. First, Mr. Clark has two different versions of this story. The first version was that Mr. Elder told him at the beginning that he was looking for fishing equipment. The second version from Mr. Clark is that he was at the Home Office and agrees to the search of his property and as they are going out to the car, that's when Elder refers to fishing.

THE COURT:

That was in Mr. Clark's handwritten statement that was admitted. But that doesn't make it substantive evidence. It's just impeachable.

MR. RHOADS:

Well I think he changed his story on the stand to coincide with the written statement.

THE COURT:

*I thought he just simply said he couldn't remember, that he didn't agree. I think it is fairly critical, and I am willing to review the record.* The defense used it to demonstrate that Mr. Clark was telling two different stories. The reason I think that is critical is because I don't recall him conceding that it was all outside when the fishing stuff came up. The point I am making is there was something admitted that contradicted his live testimony to the jury but it was up to the jury to decide whether that impeached his credibility.

MR. RHOADS:

*My recollection of the trial is that he did change his story and adopt the written version. That's my recollection of what happened.*

THE COURT:

*If Mr. Rhoads is right that he then, when confronted with this written statement, he changed his testimony to the jury, that's one thing. But otherwise, it looks like a credibility issue and the jury arguably accepted his live testimony versus what he wrote.*

(Emphasis added.)

The trial court apparently recognized that there would be no credibility issue for the jury if the record showed that Mr. Clark adopted his contemporaneous written notes that the consent given in the Quail Room was a general consent. The trial court stated that he was willing to review the record on this point. However, he did not do so, but relied on his memory to the effect that Mr. Clark did not withdraw his testimony that the search agreed upon was limited to fishing equipment.

The record reflects otherwise. Mr. Clark admits that his contemporaneous notes are correct and states that he was mistaken in testifying that the search agreed to in the Quail Room was a limited search. No question of credibility remains when the party plaintiff makes a judicial admission of a point that is vital to the determination of whether a valid general search was agreed upon.

Because the oral consent to a general search was given, the next question is whether the written consent to a general search modified or limited the oral consent. Mr. Clark testified that he felt threatened and believed that Wal-Mart was trying to "railroad" him. However, the evidence overwhelmingly establishes that Clark's consent was knowing and voluntary. First, Clark signed the form, which specifically authorized a search of the entire premises by Rogers police and Wal-Mart Loss Prevention Officers. The written consent authorized the officers to take from the premises any property that they deemed necessary, and Clark never indicated that the search should be limited in any way. Second, Clark testified on direct examination that he did not tell the police or loss-prevention officers to leave his property because he "figured they could do whatever they wanted to." Third, Clark testified that he unlocked the doors to his shop. Fourth, when asked about merchandise, Clark testified that he said, "take it if you want it." Fifth, Mrs. Clark testified that she served beverages

to people on that hot day during the search. Finally, at the conclusion of the search, Mrs. Clark testified that she indicated to the police and loss-prevention officers that there were also some things in the attic and suggested that they not forget those items.

I recognize that the jury's assessment of damages in this case is a reflection of the factual circumstances of this case, which also involve the defamation that followed after Wal-Mart's actions, but I cannot agree with the treatment of the intrusion invasion of privacy claim. Because I cannot agree with the majority's conclusion that there was substantial evidence that Clark had a legitimate expectation of privacy after he had given verbal and written consent to search his property, I respectfully dissent.